# THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA, and
STATE OF NEW MEXICO, ex rel.
JOSE HERNANDEZ-GIL, DMD,
Relator

      Plaintiff,

v.                                                                          No. Civ. 13-1141 JH/KBM

DENTAL DREAMS, LLC A/K/A DENTAL
EXPERTS, LLC, an Illinois limited liability
company, SAMEERA TASNIM HUSSAIN,
DMD, individually and as an organization
agent, DENTAL DREAMS, LLC, a New
Mexico limited liability company, FAMILY
SMILES, LLC, a New Mexico limited
liability company, FRANK VON
WESTERNHAGEN, DDS, individually and
as an organization agent, KOS SERVICES,
LLC, an Illinois limited liability company, and
KHURRAM HUSSAIN, ESQ., individually
And as an organization agent,

      Defendants.

## MEMORANDUM OPINION AND ORDER

On March 2, 2015, Defendants filed an Amended Motion to Dismiss Plaintiff's Complaint (ECF No. 25). This Court, having considered the pleadings, motion, briefs, and relevant law, concludes that it has jurisdiction and the motion to dismiss should be granted in part and denied in part. The Court will dismiss, only to the extent they are based on a nationwide fraud theory and a worthless services theory, Plaintiff Jose Hernandez-Gil's claims brought under the False Claims Act ("FCA"), 31 U.S.C. § 3729-3731, New Mexico Medicaid False

Claims Act, N.M. Stat. Ann. §§ 27-14-1 *et seq.* ("MFCA"), and the New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. §§ 44-9-1 *et seq*. (2007) ("FATA"). The Court will also dismiss for failure to state a claim Plaintiff's negligence claim in Count XIX. In all other respects, Defendants' amended motion to dismiss will be denied.

## I.      INTRODUCTION

According to the Complaint, Plaintiff Jose Hernandez-Gil, DMD, ("Plaintiff" or "Relator") is a licensed dentist who Defendant Dental Dreams, LLC ("Dental Dreams") briefly employed from May 13 to May 28, 2013. The core of Relator's complaint is that, during his employment, Dental Dreams and related entities and their owners billed the Medicaid program for procedures that were not performed, were not medically necessary, and were of such poor quality as to be worthless. Verified Compl. ("Compl.") ¶ 1, ECF No. 1. Relator, on behalf of the United States, sued under the FCA, and he brought his action on behalf of the State of New Mexico ("State"), under the MFCA and FATA. Compl. ¶ 2, ECF No. 1. He also asserted claims for retaliation under each of these acts, as well as under the Americans with Disabilities Act, 42 U.S.C. § 12203 ("ADA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-3(a) and 2000e-5, and the New Mexico Human Rights Act ("NMHRA"), N.M. Stat. Ann. §§ 28-1-7(i)(1) and (2); claims for discrimination under the ADA, Title VII, and NMHRA based on disability, sex, and sexual orientation; and seven assorted state law claims. *See* Compl. ¶¶ 270-390. The United States and the State declined to intervene. Notice 1, ECF No. 10.

## II.      FACTUALBACKGROUND

Dental Dreams, LLC, a/k/a Defendant Dental Experts, LLC, ("Dental Experts") is an Illinois single-member limited liability company whose sole member is Defendant Sameera Tasnim Hussain, DMD ("Dr. Hussain"). Compl. ¶ 1, ECF No. 1. Defendant Dental Dreams,

LLC, ("Dental Dreams" or "DD-NM") and Defendant Family Smiles, LLC, ("Family Smiles") are separate New Mexico single-member limited liability companies and are subsidiaries or affiliates of Dental Experts. *Id.* Defendant Frank Von Westernhagen, DDS, is the sole owner of Family Smiles but never significantly worked in, managed, or maintained contact with the clinics. *Id.* ¶¶ 1, 3. Dr. Westernhagen had no visible role in hiring, managing, or terminating Relator; rather, he is a straw-person employed by Dental Experts. *Id.* ¶¶ 59-60.

Relator alleges that Dental Experts and Dr. Hussain are alter egos controlling a "corporate dental practice of eleven states plus the District of Columbia, dozens of corporate subsidiaries and affiliates, 200+ dentists, 800+ employees, and up to $75 million per year in claims for Medicaid reimbursement." *Id.* ¶ 3. Relator extensively lists the details of the interrelationship of Defendants and the out-of-state affiliates and purported alter egos, asserting that the entities share common management with Dr. Hussain and Defendant Khurram Hussain, Esq. ("Attorney Hussain"), among others, exercising formal and acting roles of management and supervision among the different entities. *See id.* ¶¶ 29-73. Essentially, Relator contends that Defendants "are an integrated enterprise, single employer, and alter egos engaged in the corporate practice of dentistry nationally and in the State of New Mexico." *Id.* ¶ V(A), at 15.

Dental Experts expanded to New Mexico in early 2011, forming three Albuquerque clinics as Family Smiles. *Id.* ¶ 3. Defendant KOS Services, LLC ("KOS"), an Illinois single-member limited liability company, and Attorney Hussain, the sole member of KOS and Dr. Hussain's husband, ran the clinics. *Id.* Dr. Nidhi Agarwal, DDS, and Dr. Noah Michael Shafer, DDS, were dentists working for Defendants. *See id.* ¶¶ 4(a), (d), (e). Edith Pinto was Defendants' Regional Manager. *Id.* ¶ 4(d).

Dental Experts hired Relator and said he would inherit Dr. Agarwal's practice, but after

Relator quit his existing job, Dental Experts said he would earn less than what was promised because Dr. Agarwal was still working for them. *Id.* ¶ 4(a). Relator began working for pay on May 13, 2013, a week later than what Dental Experts initially told him. *Id.* ¶ 4(a), ¶ 115. During his orientation, Relator told Ms. Pinto that he would be bringing in a Service Dog. *Id.* ¶ 115. When pressured by Ms. Pinto on two different occasions to tell her what his disability was, Relator reluctantly said it involved Post Traumatic Stress Disorder ("PTSD"), that he had difficulty in crowds, could freeze in public, was sensitive to yelling and verbal aggression, and that his dog, Boscoe, was trained to calm him and help him get up if he fell. *See id.* ¶¶ 115-116.

From May 15 through May 28, 2013, Relator followed up with numerous patients previously seen and treated by a group of Family Smiles dentists including Dr. Shafer and Dr. Agarwal. *Id.* ¶ 133. Among approximately 20 patients previously treated by Dr. Shafer whom Relator saw, Relator found that for almost every patient:

a. Dr. Shafer had charted dental services as being completed in a prior visit;

b. Relator's examination found the patient had not, in truth, received the charted service (including, for example, numerous instances in which Dr. Shafer had charted cavities being filled, when in fact the indicated teeth contained no filling);

c. the patient chart documented that Dr. Shafer had approved the un-performed service for submission to the applicable payor for payment/reimbursement;

d. the chart, combined with Relator's knowledge of Network practices, reflected that the Network had billed/submitted the un-performed services to the payor; and

e. the chart reflected that the payor for the service was Medicaid.

*Id.* ¶ 134. Defendants "falsely certified the completion and date of these services." *Id.* ¶ 135. Relator refers to these particular claims as "Shafer's Unperformed Services Claims," Pl.'s Resp. 9, ECF No. 44.

Relator also discovered that Dr. Shafer performed a Mesial-Facial Incisal Lingual

("MFIL") procedure on a "baby" tooth of a pediatric patient six months earlier, but Relator's examination found the tooth had no roots and would soon fall out, making the MFIL "unnecessary and substantially worthless." *Id.* ¶ 136. Relator observed that the patient's chart documented that Dr. Shafer approved the "worthless" service for submission to the applicable payor for payment and, relying on the chart and his knowledge of Defendants' practices, he believed Defendants billed the "worthless" service to Medicaid. *Id.* The Network "falsely certified the medical necessity of the referenced services." *Id.* ¶ 137. Relator calls this "Shafer's False Medical Necessity Claim." Pl.'s Resp. 10, ECF No. 44.

As for the claims Relator describes as "Agarwal's False Medical Necessity Claims," Pl.'s Resp. 10, ECF No. 44, among the approximately 20 patients previously treated by Dr. Agarwal whom Relator saw from May 15 through May 28, 2013, he found in about half the cases:

a. Dr. Agarwal, in a prior visit, had charted diagnosis of a condition requiring dental services, such as a cavity requiring filling;

b. Relator's examination found the diagnoses to be false by professionally-recognized standards of care (including, for example, numerous instances in which the condition that Dr. Agarwal had charted as a cavity was, in truth, only a stain);

c. the patient chart reflected that Dr. Agarwal had already performed or scheduled to be performed unnecessary dental services based on the false diagnosis;

d. where the unnecessary dental service had already been performed:

i. the patient chart documented that Dr. Agarwal had approved the medically unnecessary service for submission to the applicable payor for payment/reimbursement;

ii. the chart, combined with Relator's knowledge of Network practices, reflected that the Network had billed/submitted the medically unnecessary service to the payor; and

iii. the chart reflected that the payor for the service was Medicaid.

*Id.* ¶ 139.

Regarding "Agarwal's Deficient Performance Claims," Pl.'s Resp. 10, ECF No. 44, among those same 20 former patients of Dr. Agarwal, Relator discovered that in approximately half the cases:

> a. Dr. Agarwal had charted dental services as being completed in a prior visit (including, for example, numerous fillings of cavities);
>
> b. Relator's examination found the charted service had been performed by Dr. Agarwal under such circumstances that the services were worthless to the patient (including, for example, a number of instances in which Dr. Agarwal had performed fillings in such a deficient manner—such as leaving a void in the tooth behind the amalgam—that the tooth suffered further decay and would thus require a full pulpotomy or baby root canal);
>
> c. the patient chart documented that Dr. Agarwal had approved the service in question for Network submission to the applicable payor for payment/reimbursement;
>
> d. the chart, combined with Relator's knowledge of Network practices, reflected that the Network had billed/submitted the worthless service to the payor; and
>
> e. the chart reflected that the payor for the service was Medicaid.

Compl. ¶ 141, ECF No. 1. Defendants submitted these claims to Medicaid for substantially worthless services. *Id.* ¶ 142.

On May 15, 2013, upon discovering the billing practices of Dr. Shafer and Dr. Agarwal, Relator reported the situation to Officer Manager Clint Sandoval. *See id.* ¶ 4(g), ¶ 158. Mr. Sandoval admitted that Relator would find a lot of that from them, to which Relator replied this was fraud. *Id.* ¶¶ 159-60. Later that day, Relator reported to Ms. Pinto what he had found with the patients and charts of Dr. Shafer and Dr. Agarwal. *Id.* ¶¶ 163-64. On May 16, 2013, Relator again spoke with Mr. Sandoval about the practices of Dr. Shafer and Dr. Agarwal and asked whether the Network was doing or would do the requisite audit. *Id.* ¶ 173. Mr. Sandoval replied that Ms. Pinto, Dr. Hussain, and Attorney Hussain were all aware of the practices. *Id.*

On May 20, 2013, Relator again spoke with Ms. Pinto about his concerns, recounting all of the files of Dr. Shafer that he found with procedures charted and billed to Medicaid, but never actually performed, and Dr. Agarwal's pattern of prescribing work when none was actually necessary and of performing work in a defective manner as to be worthless or to cause the patient harm. *Id.* ¶¶ 175-76. Ms. Pinto responded that she was aware of the situation and informed him there were forms to fill out if he found more of these situations. *Id.* ¶ 177.

Two days later, Relator found more patient charts indicating services had been performed and billed, when in fact, they had not. *Id.* ¶ 178. He reported to Mr. Sandoval the additional fraudulent charges he discovered that day. *Id.* ¶ 179. Mr. Sandoval replied that the company wanted Relator to do the missing work, fill out a form, and allow his production to be credited with the work. *Id.* ¶ 180. Relator responded that the company's response was inadequate by law, and that it would need to report it and do an audit. *Id.* ¶ 181. Mr. Sandoval said that the company would not do that because they would lose too much money. *Id.*

Beginning May 15, 2013, when Mr. Sandoval learned Relator was gay, Mr. Sandoval began making unwanted physical contact with him, touching him and rubbing his back, despite Relator repeatedly telling him to stop. *Id.* ¶ 186. On May 24, 2013, Mr. Sandoval once more put his hands on Relator, and Relator angrily told him never to touch him again. *Id.* ¶ 189.

The next day, Ms. Pinto and Relator discussed conflicts Relator was having with staff and his unhappiness with his work schedule. *See id.* ¶ 193. Relator reported Mr. Sandoval's unwelcome touching and his belief that Mr. Sandoval was retaliating against him by exaggerating to Ms. Pinto Relator's conflicts with staff. *See id.* ¶ 194. Ms. Pinto changed the subject, scolding him for not telling her he was bringing Boscoe to work. *Id.* ¶ 195. Relator said that Boscoe was a Service Dog in training and they argued about bringing his dog to work. *Id.* In

further explaining that he did not want to work in the Coors Clinic, Relator reminded her of Drs. Shafer and Agarwal's patients with work billed and not done or that needed to be redone. *Id.* ¶ 196.

On May 27, 2013, Ms. Pinto complained to Relator about not keeping Boscoe in a cage at work. *Id.* ¶ 197. Relator told her that he saw another patient of Dr. Shafer for which work was billed and not done. *Id.* In another conversation with Ms. Pinto that day, Relator reiterated how he found more patients that Dr. Shafer billed for work not done, unnecessary, or shoddy, and how Dr. Agarwal was doing shoddy work and over-diagnosing to boost production. *Id.* ¶ 198. He said they had to do an audit because by law they had to report this to Medicaid. *Id.* Ms. Pinto said it would be taken care of and that Boscoe could not be in the office. *Id.*

The next day, on May 28, 2013, Relator brought Boscoe into the clinic. *Id.* ¶¶ 199-203. While awaiting a video conference with Attorney Hussain, Relator overheard him scream that he did not want a dog in his clinic and did not care whether it was a service dog. *Id.* ¶¶ 202-04. In his conversation with Relator, Attorney Hussain told him that Boscoe was not a Service dog, he would not have any dog in his clinic, and either Relator would leave Boscoe at home or he would be fired. *Id.* ¶ 209. Relator responded that he needed Boscoe, would bring him to work, and if Attorney Hussain was going to fire him for it, he might as well do it now. *Id.* ¶ 210. Attorney Hussain fired him on the spot. *Id.* ¶ 211. Relator then told Mr. Sandoval he was waiting for a letter stating he was fired and wanted his paycheck immediately. *Id.* ¶¶ 212-17. When Mr. Sandoval called Attorney Hussain on speaker phone to explain the situation, Relator heard Attorney Hussain yell, "I'm not giving that fucking fag anything!" *Id.* ¶¶ 218-19. Relator left and did not return to work. *See id.* ¶¶ 221-22.

On September 27, 2013, Relator filed a Charge of Discrimination with the New Mexico

Human Rights Bureau ("Bureau") and EEOC against Defendants, among others, asserting sex, sexual orientation, and disability discrimination as well as retaliation arising from discrimination occurring from May 15 to May 28, 2013. *See* Pl.'s Resp. Ex. 1, ECF No. 44-1. On November 27, 2013, Relator filed his Complaint, but he did not allege that he had filed administrative charges or otherwise exhausted his administrative remedies under the ADA, Title VII, or NMHRA. *See* Compl., ECF No. 1. On December 5, 2013, Defendants filed their administrative response to the Charge of Discrimination. *See* Pl.'s Resp., Ex. 2, ECF No. 44-2.

The Bureau issued its letter of determination of no probable cause on February 27, 2014. Pl.'s Resp., Ex. 3, ECF No. 44-3. In the letter, the Bureau noted that Relator failed to provide medical documentation or evidence to rebut Defendants' response and failed to submit a rebuttal or any evidence to support his allegations of discrimination. *Id.*, ECF No. 44-3 at 10 of 15. On April 9, 2014, the EEOC issued its Dismissal and Notice of Rights, adopting the Bureau's findings. *See* Pl.'s Resp., Ex. 4, ECF No. 44-4.

## III.    STANDARD

Under Rule 12(b)(1), a court may dismiss a case for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Exhaustion of Plaintiff's administrative remedies is a statutory and jurisdictional prerequisite to his bringing claims of employment discrimination and retaliation under the ADA, Title VII, and the NMHRA. *Jones v. U.P.S.*, 502 F.3d 1176, 1183 (10th Cir. 2007) (Title I of the ADA); *Shikles v. Sprint/United Management Co.*, 426 F.3d 1304, 1308-10 (10th Cir. 2005) (Title VII and ADA); *Mitchell-Carr v. McLendon*, 1999-NMSC-025, ¶¶ 10, 17, 980 P.2d 65 (NMHRA). "When a party challenges the allegations supporting subject-matter jurisdiction, the court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional fact."  *Davis ex rel. Davis v. United States*,

343 F.3d 1282, 1296 (10th Cir. 2003) (internal quotations omitted).  A court's reference to such evidence when ruling on a Rule 12(b)(1) motion does not convert the motion to dismiss to a Rule 56 motion for summary judgment. *Id.* The Court will therefore consider the documents attached to Relator's response (the Charge of Discrimination, Defendants' response to the Charge, the Bureau's Determination of No Probable Cause, and the EEOC's Dismissal and Notice of Rights) when determining its jurisdiction without converting the motion to one for summary judgment.

The Court may also dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A plaintiff's complaint must set forth factual allegations that "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). It is not enough for a plaintiff to just set forth labels, conclusions, and formulaic recitation of the elements of a cause of action. *Id.* When reviewing a complaint in ruling on a Rule 12(b)(6) motion, the Court must accept all well-pleaded allegations as true. *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009). The Court must view the allegations in the light most favorable to the plaintiff. *Id.* The Court "will disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012). A plaintiff need not prove his case in the complaint, but he needs to give enough facts to show that relief is plausible. *U.S. ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1169 (10th Cir. 2010).

For claims based on fraud, Rule 9(b) sets forth the pleading standard: "a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). A plaintiff alleging an FCA claim must plead the who, what, when, where, and how of the claim; in other

words, he must identify the time, place, content, and consequences of the fraudulent conduct sufficient to give the defendant fair notice of the claims and factual grounds to prepare a responsive pleading. *U.S. ex rel. Lemmon*, 614 F.3d at 1171-72. "Thus, claims under the FCA need only show the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme." *Id.* at 1172.

### IV.   ANALYSIS

#### A.   Claims under the FCA, MFCA, and FATA (Counts I-III)

The FCA allows an individual ("relator") to sue on behalf of the government for fraudulent attempts to cause the government to pay out money. *Id.* at 1167. Relator brings claims under Section 3729(a)(1)(A), (B), and (G) of the FCA, which impose liability on any person who

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; … or
>
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1)(A), (B), and (G).

FATA closely tracks the FCA. *State ex rel. Peterson v. Aramark Correctional Services, LLC*, 2014-NMCA-036, ¶ 4, 321 P.3d 128. "FATA prohibits knowingly presenting false or fraudulent claims for payment from the State and conspiring to defraud the State." *State ex rel. Foy v. Austin Capital Management, Ltd.*, 2015-NMSC-025, ¶ 25, 355 P.3d 1 (citing N.M. Stat. Ann. § 44-9-3(A)). It also prohibits knowingly making or using, or causing to be made or used, a false or fraudulent record to obtain payment on the false or fraudulent claim. N.M. Stat. Ann. §

44–9–3(A)(1), (2).

The MFCA prohibits similar conduct forbidden by the FCA and FATA, but specifically targeting fraud on the Medicaid program. N.M. Stat. Ann. § 27-14-4 (2004). The MFCA makes it unlawful for a person, knowing the respective claim, record, or statement to be false, to present or cause to be presented a false or fraudulent claim to Medicaid (§ 27-14-4(A)); to make, use, or cause to be made or used a false or fraudulent record or statement to Medicaid (§ 27-14-4(C)); to conspire to defraud the State by getting Medicaid to allow or pay a false or fraudulent claim (§ 27-14-4(D)); to make, use, or cause to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State related to Medicaid (§ 27-14-4(E)); or to make a Medicaid claim for a service or product not provided (§ 27-14-4(H)). *Id.*

### 1. New Mexico-based theory of fraud

Defendants argue that Relator's complaint fails to state a claim under the FCA, MFCA, and FATA because he did not identify any actual claims submitted to Medicaid, dates of claims, dates of service, amounts billed, or patient identifying information. They contend that Relator's allegation that he reviewed approximately 40 patient charts in an identified two-week period is not sufficient to meet Rule 9(b)'s heightened pleading standard.

A central element for liability under the FCA is that a defendant presented a false or fraudulent claim to the government. *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 727 (10th Cir. 2006). To state an FCA claim, a relator must do more than allege simply, and without any stated reason, his belief that claims requesting illegal payment must have been or were likely submitted to the government. *Id.* (quoting *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002)). Alleging the

underlying scheme or wrongful activities is not sufficient to satisfy Rule 9(b):

> [A] relator must provide details that identify particular false claims for payment that were submitted to the government. In a case such as this, details concerning the dates of the claims, the content of the forms or the bills submitted, their identification numbers, the amount of money charged to the government, the particular goods and services for which the government was billed, the individuals involved in the billing, and the length of time between the alleged fraudulent practices and the submission of claims based on those practices are the types of information that may help a relator to state his or her claims with particularity. *These details do not constitute a checklist of mandatory requirements that must be satisfied for each allegation included in a complaint. However, … we believe that some of this information, for at least some of the claims must be pleaded in order to satisfy Rule 9(b).*

*Id.* at 727-28 (quoting *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 232-33 (1st Cir. 2004)) (italics added and internal quotations omitted).

Although the "when" is not comprised of exact dates, the allegations provide a small enough timeframe – approximately two weeks -- and enough specific details of who, what, where, and how to notify Defendants with sufficient particularity of the claims against which they must defend for the approximately 40 patients' files Relator reviewed that he asserts, based on his knowledge of Network practices, resulted in false claims. *See* Compl. ¶¶ 133-142. Relator alleged that the "who" involved in making the false statements are Dr. Shafer and Dr. Agarwal. *Id.* He seeks to add allegations that Ms. Pinto was responsible for submitting the claims to Medicaid for reimbursement under the clinic's procedures. *See* Pl.'s Resp. 11 n.4 & 25, ECF No. 44. He also requests to add allegations that he saw a total of between 80 and 100 patients, so about 40-50% of the work he did for Defendants would fall into the category of following up on services that were fraudulently billed to Medicaid. Pl.'s Resp. 11 n.3, ECF No. 44. While Relator has not provided exact dates, identification numbers, amounts of money owed, patient names, or the dates upon which the forms would have been submitted to the government, these additional details should be relatively easy to discover by reviewing the 80-100 patient charts Relator

identifies. Moreover, satisfying a checklist is not required. *See Sikkenga*, 472 F.3d at 727-28.

Relator also has detailed the underlying scheme by explaining the types of services for which Medicaid would have been billed and why the content of the forms that would have been submitted were fraudulent. The "what" includes: (i) Dr. Shafer recorded and approved for billing certain services, like filling a cavity, that he falsely stated he had performed; (ii) Dr. Shafer performed a medically unnecessary and worthless MFIL procedure on a baby tooth; (iii) Dr. Agarwal recorded certain services, like filling cavities that were only stains, that were false by professionally-recognized standards of care, but he falsely certified the medical necessity of dental services he performed or scheduled to be performed based on the false diagnosis and approved the unnecessary services for billing to Medicaid; and (iv) Dr. Agarwal performed procedures, including filling numerous cavities, that were so deficient as to be worthless. *See* Compl. ¶¶ 134-142, ECF No. 1.

Finally, Relator alleged that the "where" was the Family Smiles' Atrisco clinic. Based on his personal knowledge of the clinic's practices and review of patient charts, Relator stated the "how" was by Edith Pinto submitting the allegedly false claims to Medicaid. These allegations are adequate to indicate the claims were actually submitted. *See United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) ("We hold that to plead with particularity the circumstances constituting fraud for a False Claims Act § 3729(a)(1) claim, a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.").

In arguing that the allegations are insufficient under Rule 9(b), Defendants rely on the unpublished case of *United States ex rel. Lacy v. New Horizons, Inc.*, 348 F. App'x 421, 2009

WL 3241299 (10th Cir. Oct. 9, 2009). In *Lacy*, the relator described an improper scheme from June 1999 to April 2004 in which the defendant submitted bills at the beginning of each month to patients and to government programs seeking payment for services to be performed for patients during that month, despite that bills must be submitted for reimbursement after services have been provided. *See id.* at 424-25. Although the Tenth Circuit found the nearly five-year time period to be "fairly specific," it concluded there were no specific details concerning any particular false claim for payment that would be representative of the class described or of what feature of the billing submitted on the forms was altered or falsified to avoid being rejected out of hand as an impermissible forward billing. *See id.* at 425-26.

In contrast to *Lacy*, Relator has alleged, as to the false claims arising from the Atrisco clinic, a far narrower and specific timeframe in terms of weeks, not years. He has included a much smaller class of patients limited to certain procedures performed by two identified dentists in one New Mexico clinic and has explained how the charts indicate false claims were submitted for payment to Medicaid. These allegations are sufficient under Rule 9(b). The Court will therefore deny Defendants' request to dismiss Relator's FCA, MFCA, and FATA claims arising from the alleged false claims arising from the Family Smiles clinic and will grant Relator leave to amend to add the aforementioned requested allegations. *Cf. U.S. ex rel. Lemmon*, 614 F.3d at 1172-73 (rejecting argument that complaint had to provide the "what and how" of actual presentment of false claim for payment to treasury and holding that complaint satisfied Rule 9(b) where plaintiffs alleged enough information to describe fraudulent scheme to support plausible inference that false claims were submitted); *United States ex rel. Grubbs*, 565 F.3d 180 at 191-92 (concluding complaint met Rule 9(b) where it alleged conspiracy by doctors to seek reimbursement from governmental health programs for services that never were performed and

dates that each doctor falsely claimed to have provided services; allegations constituted "more than probable, nigh likely, circumstantial evidence that the doctors' fraudulent records caused the hospital's billing system in due course to present fraudulent claims to the Government").

### 2. Nationwide theory of fraud

Relator, however, also extrapolates beyond the approximately 40 patients to a nationwide fraudulent billing practice. He admits, though, that "the Complaint lacks any specifics of the fraudulent billing that did not intersect with his own professional services. That is, although there is substantial reason to believe that improper and fraudulent billing occurred outside of Defendants' New Mexico office, the Complaint includes no information (and Relator has none) concerning which specific services for which specific patients were falsely presented to the government for payment." Pl.'s Resp. 8-9, ECF No. 44. Relator instead argues that because he had specifics of some of the fraud, the general allegations should stand.

As to these general nationwide allegations, they are more like the board-ranging allegations in the *Lacy* case that the Tenth Circuit determined did not meet Rule 9(b) because the relator had not shown a single instance of a particular false claim that would be representative of the class described. *See Lacy*, 348 F. App'x at 425. Although the approximately 40 specific cases may be representative of a scheme at the Family Smiles clinics, Relator has not alleged enough non-conclusory facts to plausibly indicate that the purportedly false claims in the New Mexico clinics are representative samples of a broader class of claims for any or all clinics operated by Defendants in other states. *Cf. United States ex rel. Bledsoe v. Community Health Sys., Inc.*, 501 F.3d 493, 510 (6th Cir. 2007) (stating that relator who pleads complex and far-reaching fraudulent scheme must provide examples of specific false claims that are representative samples of broader class of claims); *Sikkenga*, 472 F.3d at 728 (refusing to permit conclusory, speculative

allegations of fraud under FCA to move forward, even though specific information was exclusively within control of defendants). The Court will thus grant Defendants' motion to dismiss as to the theory of a nationwide fraudulent scheme extending beyond Family Smiles' New Mexico clinics.[1]

### 3. Distinguishing among theories of fraud

Defendants further contend that, in Count I, Relator cited three subsections of the FCA, but failed to distinguish among his theories of liability. Relator responds that his theories of liability as to each subsection are as follows: (i) under subsection (a)(1)(A), Defendants are liable "because they knowingly presented to Medicaid claims for payment for the unperformed, unnecessary, and inadequate services supposedly provided by Drs. Shafer and Agarwal;" (ii) under subsection (a)(1)(B), they are liable because "the patient charts and other of Defendants' records which are made or used for the purpose of getting a false claim paid are false, in that they include approvals for Medicaid payment despite not qualifying for Medicaid because the services were either unperformed, unnecessary, or inadequate;" and (iii) under subsection (a)(1)(G), Defendants are liable because, after submitting the false claims to Medicaid, they owed the government an obligation to refund money to the United States and have made and used false records to conceal, avoid, or decrease that obligation. Pl.'s Resp. 14-15, ECF No. 44. Relator argues that dismissal is inappropriate because he should be given leave to amend his complaint to separate the theories of liability into separate counts under the FCA, as well as to better allege his theories of liability and the respective subsections as to his MFCA and FATA claims. The Court agrees that amendment will cure any purported notice deficiencies regarding the remaining theories arising from Defendants' New Mexico clinics, and will grant Relator leave to amend to

---

[1] Because Relator has disavowed asserting liability under the FCA, MFCA, and FATA based on a corporate practice of dentistry theory, Pl.'s Resp. 17, ECF No. 44, the Court will not address Defendants' arguments relating thereto.

add allegations differentiating his theories of liability under the FCA, MFCA, and FATA.

### 4.  Worthless services theory

A worthless services theory is based on "the knowing request for federal reimbursement for a procedure with no medical value." *Mikes v. Straus*, 274 F.3d 687, 702 (2d Cir. 2001), *abrogated on other grounds by Universal Health Services, Inc. v. United States*, 136 S.Ct. 1989 (2016). The performance of a service that is so deficient as to be worthless is the functional equivalent of no performance at all. *See id.* at 703. Allegations that the defendant provided services that were worth less than the services paid for ("diminished value") is not sufficient. *U.S. ex rel. Absher v. Momence Meadows Nursing Center, Inc.*, 764 F.3d 699, 710 (7th Cir. 2014) (discussing standard, but declining to decide validity of "worthless services" as a separate claim because evidence did not show services were worthless). To prevail on a worthless services claim, the plaintiff must show that the defendant knew the procedure billed had no medical value; negligence is insufficient. *See Mikes*, 274 F.3d at 703. The Second, Sixth, Eighth and Ninth Circuits have recognized the worthless services claim under the FCA. *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 468 (6th Cir. 2011); *U.S. ex rel. Roop v. Hypoguard USA, Inc.*, 559 F.3d 818, 824 (8th Cir. 2009); *Mikes*, 274 F.3d at 703; *United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1053 (9th Cir. 2001).

Although the Tenth Circuit has yet to address this theory, it has given no indication that it would not adopt the "worthless services" theory of FCA liability. The Court nevertheless declines to address this issue because alternative grounds warrant dismissal. Defendants argue that Relator's "worthless services" claims must be dismissed under Rule 12(b)(6) because he failed to allege that any procedures performed by Dr. Shafer or Dr. Agarwal conferred no value whatsoever to the patients. Defs.' Mot. 15, ECF No. 25. In response, Relator explains that his

"Complaint pleads a 'worthless services' claim only as to Agarwal's Deficient Performance Claims." Pl.'s Resp. 15, ECF No. 44. The Court will thus limit its analysis accordingly. As to the "Deficient Performance Claims," Relator alleges that Dr. Agarwal performed certain procedures that were "worthless to the patient," and offers, by way of example, instances in which Dr. Agarwal performed fillings in a deficient manner, such as leaving a void in the tooth behind the amalgam, that the tooth suffered further decay and would require a baby root canal. Compl. ¶ 141, ECF No. 1.

Although Relator uses the conclusory "worthless services" phrase, the specific facts underlying the conclusion do not plausibly suggest that he can show that the procedure had no medical value and that Defendants knew the procedure was so deficient as to amount to no procedure at all. Rather, the allegations suggest a service of poor quality, and negligence is not sufficient. *Compare Chesbrough*, 655 F.3d at 469 (concluding that allegations that defendant knew it submitted claims for "completely nondiagnostic tests" could support worthless services claim); *with Hypoguard*, 559 F.3d at 824 (holding that allegations that defendant's products, when misused, resulted in serious adverse consequences did not state claim absent showing that party knowingly or with deliberate ignorance charged government for worthless services). The Court will dismiss Relator's "worthless services" theory of liability for failure to state a claim.[2]

## B.    Retaliation under FCA, MFCA, and FATA (Counts IV-VI)

The FCA provides whistleblower protections for an employee who is terminated, threatened, harassed, or otherwise discriminated against in the terms and conditions of his employment because of a lawful act taken "in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1) (2012) (as

---

[2] Relator has not asked for permission to amend the complaint to add further allegations to support his worthless services theory.

amended effective May 2009). Congress amended Section 3730(h) to expand the definition of protected activity to include "other efforts to stop 1 or more violations." *See United States v. Deming Hosp. Corp.*, 992 F.Supp.2d 1137, 1163 (D.N.M. 2013) (and citations therein). To state an FCA retaliation claim, a plaintiff must allege that (1) he took action in furtherance of an FCA enforcement action, (2) his employer had notice that he was taking action in furtherance of a private *qui tam* action or assisting the government in bringing an FCA action; and (3) he was discharged or discriminated against because of the protected conduct. *See McBride v. Peak Wellness Center, Inc.*, 688 F.3d 698, 704 (10th Cir. 2012). The MFCA and FATA contain similar anti-retaliation provisions. *See* N.M. Stat. Ann. § 27-14-12, § 44-9-11(B).

Construing the FCA whistleblower provision in place prior to the 2009 amendment, the Tenth Circuit held that an employee does not need to have filed a *qui tam* action for whistleblower protection. *McBride*, 688 F.3d at 704. Notice that informs the employer merely of regulatory violations without giving a suggestion that the plaintiff is going to report the non-compliance is insufficient. *Id.* On the other hand, notice may be satisfied by informing the employer that its illegal activities constitute fraud on the United States, by warning the employer of regulatory noncompliance and false reporting of information to a government agency, or by explicitly informing the employer of an FCA violation. *Id.*

The allegations in this case go beyond merely pointing out regulatory violations – Relator informed Defendants of fraud on a government agency. Relator notified Mr. Sandoval of Dr. Shafer's and Dr. Agarwal's deceptive billing practices, calling it "fraud." Compl. ¶¶ 158-160, ECF No. 1. A week later, Relator reported to Ms. Pinto and Mr. Sandoval his discovery of more fraudulent charges. *Id.* ¶¶ 178-79. When Mr. Sandoval told him the company wanted him to do the missing work and fill out a form that would have falsely certified the work, Relator replied

that the company's response was inadequate by law and it needed to report it and do an audit. *See id.* ¶¶ 180-82. Relator made several demands for an audit. *Id.* ¶ 183. He told Ms. Pinto they had to do an audit because by law they had to report this to Medicaid. *Id.* ¶ 198. These allegations plausibly show that Relator gave Defendants notice that their illegal activities constituted fraud on the United States and that Relator took efforts to stop a violation of the FCA, MFCA, and FATA. The Court will therefore not dismiss Relator's retaliation claims for failure to allege adequate notice to his employer.

### C.    Exhaustion of Claims under ADA, Title VII, and NMHRA (Counts VII-XII)

Defendants contend that, by failing to allege facts that Relator exhausted his administrative remedies, this Court lacks jurisdiction to hear any of Plaintiff's discrimination or retaliation claims brought under the ADA, Title VII, and the NMHRA. Relator argues that he filed his Charge prior to filing suit, Defendants had notice and responded, the Bureau has since issued a decision, and the EEOC has issued its right to sue letter, so exhaustion is, in fact, complete. Relator asserts that he has cured any pleading deficiency, and alternatively, seeks leave to amend the Complaint to allege that administrative remedies have now been exhausted.

To exhaust administrative remedies under the ADA, Title VII, or the NMHRA, an individual claimant must timely file a charge of discrimination with the EEOC or Bureau, setting forth the facts and nature of the charge, and receive either the notice of the right to sue or order from the Bureau. *See Bertsch v. Overstock.com*, 684 F.3d 1023, 1030 (10th Cir. 2012); *Shikles*, 426 F.3d at 1309-10; *Mitchell-Carr v. McLendon*, 1999-NMSC-025, ¶¶ 10, 12, 980 P.2d 65. The first step to exhaustion is the filing of a charge of discrimination with the EEOC or Bureau. *See Jones*, 502 F.3d at 1183; *Mitchell-Carr v. McLendon*, 1999-NMSC-025, ¶ 10. Title VII creates a

work-sharing system between the EEOC and the Bureau whereby a grievant may file a grievance either with the EEOC or the Bureau *See Mitchell-Carr*, 1999-NMSC-025, ¶¶ 13-15.

A plaintiff must also cooperate with the administrative agency in good faith, a requirement that includes providing all relevant, available information. *See Shikles*, 426 F.3d at 1309-10. Perfect cooperation is not required. *Id.* at 1311. A court instead must judge compliance based on "commonsense standards," determining if the claimant cooperated as part of "a good faith attempt" to allow the administrative agency a reasonable opportunity to reach the merits of the charge. *Id.* Only in the "rare" case where a plaintiff's non-cooperation effectively prevents the administrative agency's investigation and conclusion efforts, such that it becomes a sham proceeding, will non-cooperation amount to a failure to exhaust. *See id.* at 1311-12.

 Once a person elects to proceed under state law, the NMHRA controls the grievance procedures for resolving the complaint. *Mitchell-Carr*, 1999-NMSC-025, ¶ 16. "An order of nondetermination signals that the person who filed the complaint has fully complied with the NMHRA grievance procedures and may proceed to court." *Id.* Under the NMHRA, a plaintiff can only appeal from an order of the Division, not an EEOC notice, and has only 30 days to file an appeal from the order in state court. *Id.* ¶¶ 16-19. Full compliance with the NMHRA grievance procedures is required before filing an NMHRA claim in district court. *Id.* ¶ 17.

Under the NMHRA, a court may allow a plaintiff to cure a jurisdictional defect by granting leave to amend the complaint. *Id.* ¶ 22. A plaintiff may file a Title VII action before receiving a right-to-sue letter, so long as there is no evidence "showing that the premature filing precluded the EEOC from performing its administrative duties or that the defendant was prejudiced by such filing." *Martin v. Cent. States Emblems, Inc.*, 150 F. App'x 852, 855 n.3

(10th Cir. 2005) (unpublished) (quoting *Edwards v. Occidental Chem. Corp.*, 892 F.2d 1442, 1445 n.1 (9th Cir. 1990)) (alteration omitted).

Defendants argue that Relator abandoned his administrative claims and failed to exhaust his administrative remedies when he failed to provide medical documentation of a disability, a rebuttal, or any evidence to support his allegations of discrimination. They rely on two sentences of the Bureau's decision in which it noted Plaintiff's failure to submit documentation of his medical condition or a rebuttal. This evidence is insufficient to establish that Plaintiff's premature filing precluded the Bureau from performing its duties or that Plaintiff abandoned his administrative claim. There is nothing in the record showing that the Bureau requested specific additional information in order to move forward administratively and that Plaintiff ignored or rebuffed its requests. Plaintiff's charge appears to have been sufficiently detailed and specific to allow the Bureau to conduct its investigation and reach a determination on the merits. Moreover, Defendants have not shown that the premature filing prejudiced them.

Defendants additionally argue that Plaintiff's NMHRA claims must be dismissed because he failed to timely file a notice of appeal in the state district court in the appropriate county. Defs.' Reply 13, ECF No. 46. Section 28-1-13 of the NMHRA provides that a person "may obtain a trial de novo in the *district court of the county* where the discriminatory practice occurred or where the respondent does business by filing a notice of appeal within ninety days." N.M. Stat. Ann. § 28-1-13(A) (italics added). The statute does not explicitly require that the filing of the notice of appeal be in the state, rather than federal, court of the county. Defendants have not pointed to anything in the statute or case law precluding this Court from exercising its supplemental jurisdiction and permitting amendment to cure the deficiency, as is otherwise allowed in the state district court. *Cf. Campos v. Las Cruces Nursing Center*, 828 F.Supp.2d

1256, 1273-74 (D. N.M. 2011) (holding that, although plaintiffs did not receive their orders of non-determination from NMHRD until after filing lawsuit, later receipt of determinations cured their defective exhaustion of remedies and court had subject matter jurisdiction over claims).

The Court will permit Plaintiff to amend his complaint to add the requisite jurisdictional facts regarding exhaustion of administrative remedies, and will not dismiss Plaintiff's ADA, Title VII, or NMHRA claims.

### D.        State law claims (Counts XIII-XIX)

Defendants argue that the Court should decline supplemental jurisdiction over the state law claims. Given that federal claims will remain in the case, the Court will continue to exercise its supplemental jurisdiction over the state law claims. The Court will therefore address the merits of Defendants' arguments regarding certain of those claims.

### 1.  Breach of Contract (Count XIII)

Plaintiff's employment contract contained an Integration Clause stating:

> This Agreement supersedes any and all other agreements, either oral or in writing between the parties hereto with respect to the subject matter hereof, …, and contains the entire agreement between the parties relating to said subject matter. The Agreement may not be modified except by an instrument in writing executed by the parties hereto.

Compl., Ex. 1 ¶ 24, ECF No. 3-1. Defendants argue that, to the extent Count XIII is based on alleged oral representations or other written instruments that are not part of the employment agreement, it is precluded by the integration clause as a matter of law. Defs.' Mot., ECF No. 25 at 24 of 28. Plaintiff did not address this argument in his response.

Count XIII provides that Defendants "breached express and implied terms of the Employment Agreement," including Section 14 and provisions regarding Plaintiff's start date and compensation, among others. *See* Compl. ¶¶ 360-61, ECF No. 1. The Court will thus not

dismiss Count XIII. Nevertheless, given the language of the integration clause, the Court will exclude from consideration in Count XIII any alleged breach based on any oral or unincorporated extrinsic agreement. *See Druckzentrum Harry Jung GmbH & Co. KG v. Motorola Mobility LLC*, 774 F.3d 410, 416 (7th Cir. 2014) (enforcing integration clause to preclude reliance on unmentioned extrinsic agreements); *Melnick v. State Farm Mut. Auto Ins. Co.*, 1998-NMSC-012, ¶ 18, 749 P.2d 1105 ("The agency contract between Melnick and State Farm was fully integrated, clear, and unambiguous, and we decline to rewrite the valid agreement by imposing an obligation not found in its specific, express terminology.").[3]

### 2. Breach of Contract (Count XIII) and Fraud in the Inducement (Count XIV)

Defendants next assert that the breach of contract and fraud in the inducement claims must be dismissed as to individual defendants Sameera Tasnim Hussain, DMD; Frank Von Westernhagen, DDS; and Khurram Hussain, Esq., because they were not contracting parties. Although not specifically addressing this argument, Plaintiff generally argues that the alter ego theory provides a basis for liability as to each of the defendants. Pl.'s Resp. 17-18, ECF No. 44.

The Employment Agreement states it is between Mr. Hernandez-Gil "and Family Smiles, LLC, a New Mexico limited liability company, its successors and assigns, as well as its parent, or any subsidiary, affiliate, joint venture or partner of Family Smiles, LLC (collectively 'FSL')." Compl., Ex. 1, ECF No. 3-1 at 1 of 9. In his Complaint, Plaintiff asserts that the words "parent," "subsidiary," "affiliate," "joint venture," and "partner" included Dental Experts, Dr. Hussain, Family Smiles, Dr. Westernhagen, KOS, and affiliated persons and entities with and through which Defendants engaged in the practice of dentistry. Compl. ¶ 108(a), ECF No. 1. Plaintiff

---

[3] Defendants assert, and Plaintiff does not contest, that the Employment Agreement says it "shall be governed and construed according to the laws of Illinois." Compl. Ex. 1, ¶ 19, ECF No. 3-1. Both New Mexico and Illinois law nevertheless appear to align on this issue.

additionally plead that Dr. Hussain is an alter ego of Dental Experts, *see id.* ¶ 23; Dr. Westernhagen is an alter ego of Family Smiles, *id.* ¶ 26; and Attorney Hussain is an alter ego of KOS, *id.* ¶ 27. Plaintiff alleges that Dental Experts/Dr. Hussain and KOS/Attorney Hussain are the *de facto* owners of Family Smiles clinics, employ and recruit all staff, and are the individuals with most or all material interest in equity and/or profits. *Id.* ¶ 73.

Defendants acknowledge that Plaintiff has alleged the individual defendants are alter egos of the respective corporate entities, but argue that the allegations are "conclusory" and the individual defendants "clearly" do not satisfy the terms for a party to the contract. Defs.' Mot. 23-24 & n.11, ECF No. 25. They admit, however, that the "Complaint is replete with allegations detailing Defendants' corporate formation, structure and ownership," the gist of which is that Defendants are an integrated enterprise and alter egos engaged in the corporate practice of dentistry. *Id.* at 4. Indeed, paragraphs 29 through 73 of the Complaint detail how Defendants are an integrated enterprise and alter egos in the corporate practice of dentistry nationally and in operating the Family Smiles clinics. The Court does not view the allegations as conclusory and will not dismiss the alter ego theory of liability on that basis alone.

"The alter ego theory provides another means for a breach of contract action to be maintained by or against a non-party to a contract." *HCG Platinum, LLC v. Preferred Product Placement Corp.*, No. 2:11-CV-496 TS, 2011 WL 5085035, at *2 (D. Utah Oct. 26, 2011). "Illinois courts will pierce the corporate veil where: (1) a unity of interest and ownership appears so strong that the separate personalities of the corporation and the parties who compose it no longer exist, and (2) under the circumstances, adhering to the fiction of a separate corporation would promote injustice or inequitable circumstances." *Saletech, LLC v. East Balt, Inc.*, 20 N.E.3d 796, 806 (Ill. App. Ct. 2014). In breach of contract cases, "an even more stringent

standard" applies, in which the plaintiff must show additional compelling facts, such as fraud, misrepresentation, an attempt to conceal facts, or the lack of total understanding of all transactions involved, because a party is presumed to have entered the contract with the corporate entity voluntarily and knowingly expecting any attendant consequences of the corporation's limited liability status. *Id.*

The parties have not addressed whether the Complaint satisfies the specific elements for alter ego liability to attach. The Court will not resolve these complex issues without the benefit of briefing. Given the numerous specific allegations that the individual defendants are alter egos of the respective corporate entities, Defendants have not met their burden of showing Plaintiff cannot state a breach of contract or fraud in the inducement claim against the individual defendants.

### 3. Tortious Interference with Contract Claim (Count XV)

To establish tortious interference with a contract, the plaintiff must prove (1) the defendant had knowledge of the contract between the plaintiff and a third party, (2) performance of the contract was refused, (3) the defendant played an active and substantial part in causing the plaintiff to lose the benefits of his contract, (4) damages flowed from the breached contract, and (5) the defendant induced the breach without justification or privilege to do so. *Ettenson v. Burke*, 2001-NMCA-003, ¶ 14, 17 P.3d 440. A defendant acts without justification or privilege when he acts either with an improper motive or by use of improper means. *See id.*

Proving tortious interference with contract is more complicated in a corporate setting. *Id.* ¶ 15. "Parties to a contract cannot bring an action for tortious interference with an existing contract against each other." *Deflon v. Sawyers*, 2006-NMSC-025, ¶ 6, 137 P.3d 577 (quoting *Salazar v. Furr's*, 629 F.Supp. 1403, 1410 (D.N.M. 1986)). Breach of contract is the appropriate

cause of action between parties to the same contract. *Id.* (explaining that plaintiff-employee could not have sued her corporate employer for interfering with her employment contract). "A corporate officer acting outside the scope of authority, however, may be liable for interfering with a corporate contract." *Id.* ¶ 7.

Defendants argue that Relator failed to identify the allegedly improper motive or means that caused him to lose the benefits of the Employment Agreement. Although Plaintiff neglected to brief this issue in his response, the Complaint sets forth a number of improper motives underlying his termination, including retaliation for raising issues of Medicaid fraud, discriminatory motives based on disability and sexual orientation, and/or retaliation for engaging in protected activity. *Cf. Ettenson*, 2001-NMCA-003, ¶ 19 ("For example, tortious interference with a contract of employment is not privileged if motivated by a corporate officer's anger with the former employee for spurning his sexual advances."). Plaintiff, however, has asserted Count XV against Defendants Dental Experts, Dr. Hussain, KOS, Attorney Hussain, and Dental Dreams without distinguishing among motives. The Court finds that greater specificity is needed to state a tortious interference claim against each of these Defendants, but will grant Relator leave to amend to more specifically ascribe to each Defendant Relator's allegations concerning improper motive or improper means.

Defendants additionally argue that the claim must be dismissed as to all Defendants who are parties to the contract. As to Family Smiles, the only entity that is undisputedly the named party in the Employment Agreement, Plaintiff has not asserted Count XV against it. *See* Compl. ¶¶ 374-79, ECF No. 1 (limiting claim to "[s]uch defendants," listed as Dental Experts, Dr. Hussain, KOS, Attorney Hussain, and DD-NM). As to the other entity defendants, Defendants have not clearly conceded that Dental Dreams, Dental Experts, and KOS Services, are parties to

the contract. *See* Defs.' Mot. 23-24, ECF No. 25 ("Even assuming for purposes of this motion to dismiss that the other entity defendants fit within [the Employment Agreement definition of the parties to the agreement], the individual defendants … clearly do not."). A party may state as many separate claims as it has, "regardless of consistency." Fed. R. Civ. P. 8(d)(3). The Court will not dismiss the other entity defendants on the basis that they are parties to the Employment Agreement until either the parties stipulate that the entity defendants are parties to the contract or that fact is established as a matter of law. As for the individual defendants, the Court has declined to find as a matter of law that they are not parties to the contract in light of the numerous allegations of alter ego liability and the lack of complete briefing on the issue. Defendants have not met their burden to show that Plaintiff cannot state a tortious interference with contract claim against Defendants Dental Experts, Dr. Hussain, KOS, Attorney Hussain, and Dental Dreams as a matter of law and the Court will not dismiss Count XV against them.

### 4. Negligence Claim (Count XIX)

Defendants contend that Plaintiff failed to state a negligence claim under Rule 12(b)(6) because he did not explain how Defendants breached the alleged duty of ordinary care. Relator's only allegation in this claim is "Defendants owed Relator a duty of ordinary care, which they breached by the above-described conduct, thus actually and foreseeably causing damage to Relator." Compl. ¶ 390, ECF No. 1. Plaintiff did not address this argument.

To determine if a complaint states a cause of action for negligence, the court must determine whether a duty existed as a matter of law, the existence of which "is a question of policy to be determined with reference to legal precedent, statutes, and other principles comprising the law." *Cottonwood Enterprises v. McAlpin*, 1991-NMSC-044, ¶ 10, 810 P.2d 812. "The tort of negligence must be based on a duty other than one imposed by the contract." *Id.*

¶ 11. The barebones recital in Count XIX is insufficient to make clear what duty Defendants had that they breached when they terminated Plaintiff's employment, other than a duty imposed by the Employment Agreement. The Court will therefore dismiss Count XIX for failure to state a claim.

**IT IS THEREFORE ORDERED** that Defendants' Amended Motion to Dismiss Plaintiff's Complaint (**ECF No. 25**) is **GRANTED IN PART AND DENIED IN PART** as follows:

1. Defendants' request to dismiss Relator's FCA, MFCA, and FATA claims to the extent they are based on an alleged nationwide fraud theory and worthless services theory of liability is **GRANTED** and those theories are **DISMISSED**.

2. Defendants' request to limit Count XIII only to obligations that are part of the employment agreement is **GRANTED**.

3. Defendants' request to dismiss Relator's negligence claim is **GRANTED** and **Count XIX will be DISMISSED** for failure to state a claim.

4. In all other respects, Defendants' motion to dismiss is **DENIED**.

5. Plaintiff's request for leave to amend the Complaint is **GRANTED**, to the extent described herein. Plaintiff must file an amended complaint **within 14 days of the filing of this Memorandum Opinion and Order**.

_____

**UNITED STATES DISTRICT JUDGE**