**THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA, and
STATE OF NEW MEXICO, ex rel.
JOSE HERNANDEZ-GIL, DMD,
Relator

       Plaintiff,

v.                                                                            No. Civ. 13-1141 JH/KBM

DENTAL DREAMS, LLC A/K/A DENTAL
EXPERTS, LLC, an Illinois limited liability
company, SAMEERA TASNIM HUSSAIN,
DMD, individually and as an organization
agent, DENTAL DREAMS, LLC, a New
Mexico limited liability company, FAMILY
SMILES, LLC, a New Mexico limited
liability company, FRANK VON
WESTERNHAGEN, DDS, individually and
as an organization agent, KOS SERVICES,
LLC, an Illinois limited liability company, and
KHURRAM HUSSAIN, ESQ., individually
And as an organization agent,

       Defendants.

## MEMORANDUM OPINION AND ORDER

      This matter is before the court on (i) the Motion for Summary Judgment and

Memorandum in Support (ECF No. 112), filed by Defendants on November 10, 2017; (ii)

Defendants' Motion to Exclude Certain Opinions and Testimony of Plaintiff's Expert Witness

(ECF No. 111), filed November 10, 2017; and (iii) the Motion to Partially Dismiss Amended

Complaint and to Strike (ECF No. 57), filed by Defendants on November 11, 2016. This Court,

having considered the pleadings, motions, briefs, evidence, and relevant law, concludes that (i)

Defendants' motion for summary judgment should be granted in part and denied in part as described herein, but the Court will reserve ruling for a hearing on the issue of the liability of Defendants Dental Dreams, LLC a.k.a. Dental Experts, LLC, an Illinois limited liability company, and KOS Services, LLC; (ii) Defendants' motion to exclude certain opinions of Plaintiff's expert Dr. Ryan Craig Moffat will be granted; and (iii) Defendants' motion to partially dismiss the amended complaint and to strike will be granted in part and denied in part as described herein.

## A. Defendants' Motion for Summary Judgment

Defendants filed a motion for summary judgment seeking dismissal of all claims in the amended complaint except for Count 25 against Family Smiles. In Plaintiff's response, he agreed to the dismissal of the following claims: Count 22 (Bad faith breach of contract), Count 23 (Fraud in the inducement), Count 24 (Tortious interference with contract), Count 26 (Intentional infliction of emotional distress), and Count 27 (Prima facie tort). Pl.'s Resp. 18 n.2, ECF No. 123. The Court will therefore dismiss Counts 22-24 and 26-27 and turn to the merits of the remaining counts.

### 1. Factual Background[1]

#### a. Plaintiff's Hiring and Employer

Plaintiff/Relator Jose Hernandez-Gil (hereinafter "Plaintiff") is a dentist who worked for Defendant Family Smiles, LLC ("Family Smiles") for an approximately two-week period in May 2013, pursuant to an Employment Agreement dated April 30, 2013. Def.'s Mot. for Summ. J. ("MSJ"), Undisputed Fact ("UF") ¶ 1, ECF No. 112. The employment agreement was between Plaintiff and "Family Smiles, LLC, a New Mexico limited liability company, its successors and assigns, as well as its parent, or any subsidiary, affiliate, joint venture or partner of Family

---

[1] The following facts are those supported by the record and construed in favor of Plaintiff, the non-moving party.

Smiles, LLC (collectively 'FSL')." Employment Agreement, ECF No. 52-1.

KOS Services, LLC, ("KOS") is a limited liability company ("LLC") in Illinois, and its Articles of Organization form lists Khurram Hussain as its registered agent and states that it "has management vested in … member … Khurram Hussain." Defs.' Reply, Ex. E, ECF No. 127-5 at 6-7 of 14. KOS provides administrative services for Family Smiles and Khurram Hussain is the President of KOS. Decl. of Khurram Hussain ¶ 1, ECF No. 112-5.

Dental Experts is an LLC, and its Illinois Articles of Amendment list Dr. Sameera Hussain as a member. Defs.' Reply, Ex. E, ECF No. 127-5 at 8-10 of 14. Dental Dreams was a New Mexico LLC and Dr. Sameera Hussain was its sole member. *See id.* at 12-14 of 14; Answer ¶ 24, ECF No. 56 at 14 of 112.

### b. Plaintiff's Discovery of Billing Practices at Family Smiles

Dr. Noah Shafer was a dentist employed by Family Smiles from June 2011 to September 2012, prior to Plaintiff's employment with Family Smiles. Def.'s MSJ, UF ¶ 2, ECF No. 112. Dr. Shafer was one of more than 220 dentists working for or affiliated with the entity Defendants during Plaintiff's employment. *Id.*

While employed by Family Smiles, Dr. Hernandez-Gil treated some patients, who Dr. Shafer previously had treated. *See* Dep. of Hernandez-Gil 173:22-174:5, ECF No. 123-2. In reviewing some of the patients' charts, Dr. Hernandez-Gil found records of treatments that he believed, based on his examination of the patients, had not been provided. Decl. of Hernandez-Gil ¶ 9, ECF No. 123-3. Two dentists for Family Smiles reported to Plaintiff that they were worried they were going to be fired because they were unwilling to do medically unnecessary procedures which Edith Pinto, Regional Manager for Family Smiles' New Mexico dental clinics, and the owners of the company were pressuring them to perform. *See* Dep. of Dr. Hernandez-Gil

140:15-141:24, 185:21-186:7, ECF No. 123-1; Decl. of Hernandez-Gil ¶ 15, ECF No. 123-3.

On May 15, 2013, Plaintiff reported what he had found with the patients and charts of Dr. Shafer to Edith Pinto. Decl. of Hernandez-Gil ¶¶ 15-16, ECF No. 123-3.[2] Plaintiff also told Ms. Pinto what the other dentists had told him. Dep. of Dr. Hernandez-Gil 140:15-141:24, 185:21-186:7, ECF No. 123-1.[3] At the time, Ms. Pinto acted shocked, like this was the first she was hearing of this, and she said she was going to look into it. Decl. of Hernandez-Gil ¶ 16, ECF No. 123-3; Dep. of Dr. Hernandez-Gil 185:21-186:10, ECF No. 123-1.

Minutes later on May 15, 2013, Dr. Hernandez-Gil reported the situation to Clint Sandoval, the Atrisco Office Manager. *See* Dep. of Dr. Hernandez-Gil 185:21-186:24, ECF No. 123-1; Decl. of Hernandez-Gil ¶ 10, ECF No. 123-3. Mr. Sandoval immediately admitted, "You're going to find a lot of that." Decl. of Hernandez-Gil ¶ 11, ECF No. 123-3. Mr. Sandoval acted as though he was not upset; instead, he was making fun of it and implying that it was the culture of the company. Dep. of Dr. Hernandez-Gil 253:9-22, ECF No. 123-1. Mr. Sandoval said that Edith knows all about and has known all about the allegations Plaintiff had brought to her attention. *See id.* at 185:21-188:7. Dr. Hernandez-Gil replied that it was fraud. Decl. of

---

[2] Defendants argue that Plaintiff's Declaration and Verified Complaint are self-serving and conclusory, and as such, the assertions therein do not create a dispute of fact. Plaintiff filed a Verification, swearing to numerous factual statements in the Verified Amended Complaint, *see* Verification, ECF No. 52 at 124 of 125, and he cites in his response to portions of his Verified Amended Complaint. A district court need not consider conclusory allegations in a verified complaint or affidavit. *See Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1019 (10th Cir. 2002). Plaintiff's factual assertions regarding reporting Dr. Shafer's false billing practices to Mr. Sandoval and Ms. Pinto are specific in nature, not conclusory. Although certainly self-serving, these assertions are based on personal knowledge for which Plaintiff is competent to testify, and as such, his sworn statements are admissible. *See id.* ("an affidavit must 'be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.'") (quoting Fed. R. Civ. P. 56(e) which is now Rule 56(c)(4)). Although Defendants have submitted evidence contradicting Plaintiff's testimony, at this stage in the proceedings, the Court must construe the facts supported by admissible evidence in Plaintiff's favor. So long as it is clear that the statement to which Plaintiff has sworn is "made on personal knowledge" and that he is "competent to testify on the matters stated," as required by Fed. R. Civ. P. 56(c)(4), the Court will consider the statements in the Verified Complaint as it would an affidavit or declaration.

[3] Defendants dispute that Plaintiff reported fraudulent billing or that he reported the assertions made by the other dentists to Edith Pinto. *See* Decl. of Edith Pinto ¶¶ 3-4, ECF No. 127-2. Defendants do not object based on hearsay to this assertion, so the Court will not consider this potential objection at this time.

Hernandez-Gil ¶ 12, ECF No. 123-3.

On May 16, 2017, Plaintiff spoke with Mr. Sandoval again about Dr. Shafer's fraudulent billing practices. Decl. of Dr. Hernandez-Gil ¶ 18, ECF No. 123-3. Mr. Sandoval replied that Ms. Pinto, Sameera Hussain and "Khurram" were all aware of the practices. *Id.*[4] When Plaintiff asked who was Khurram, Mr. Sandoval replied that he was Sameera Hussain's husband and attorney for the network of dental clinics and other businesses that included Family Smiles, Dental Dreams, Dental Experts, and KOS. *Id.* Mr. Sandoval referred to all these entities, together with other companies in their network, as "the company." *Id.* Mr. Sandoval explained that Sameera ran the dental side of the business, while Khurram ran the legal side, and KOS handled the money side. *Id.* He stated that Sameera and Khurram Hussain effectively own or control the entire network, regardless of whose name is on the title. *Id.* Mr. Sandoval said that Sameera and Khurram would not allow an investigation or audit into the fraudulent billing because it would cost too much money. *Id.* Mr. Sandoval then explained that the company used employment contracts in which dentists could not leave the company without giving notice a very significant period of time in advance, provisions the company would use to force the dentists that wanted to leave sooner to meet certain performance goals to gain an early release. *Id.* ¶ 19. Mr. Sandoval explained that performance goals were so high that they virtually required fraud be committed by those dentists. *Id.*

On May 20, 2013, Plaintiff told Ms. Pinto about all the files of Dr. Shafer he found with procedures charted and billed to Medicaid, but never actually performed. *Id.* ¶ 20. Ms. Pinto acknowledged she was aware of the billing fraud and said there were forms to fill out if he found

---

[4] Defendants dispute Plaintiff's assertion with contrary evidence and argue that Plaintiff relies only "on his own, self-serving testimony." Defs.' Reply, Ex. 1, ECF No. 127-1 at 6 of 15. Defendants, however, do not object to this evidence as hearsay. Because there is no specific hearsay objection, the Court will not consider the hearsay issue or whether a hearsay exception, such as Rule 801(d)(2), would apply, and instead, will consider the contents in the light most favorable to Plaintiff.

more of these situations. *Id.* ¶ 21. On May 22, 2013, Plaintiff found more instances in patient charts indicating services had been performed and billed, when in fact the services were not performed. *Id.* ¶ 22. Consistent with Ms. Pinto's direction, Plaintiff reported to Mr. Sandoval that same day the fraudulent charges he discovered. *Id.* ¶ 23. In response, Mr. Sandoval replied "the company" wanted Plaintiff to do the missing work, fill out a form, and allow his production to be credited with the work, although it would not at that time be billed. *Id.* ¶ 24. Plaintiff stated that the company's response was inadequate by law and that it needed to report it and do an audit. *Id.* ¶ 25. Mr. Sandoval said that he knew that was what the company was required to do, but it was not what the company would do because they would lose too much money. *Id.* The forms Mr. Sandoval provided Plaintiff to complete on the falsely certified work were pre-addressed to Sameera Hussain. *Id.* ¶ 26. Plaintiff submitted two such forms. *See id.*

Prior to his raising allegations of false Medicaid billing practices, in his first few days of work, Plaintiff had been getting positive feedback. Dep. of Dr. Hernandez-Gil 214:19-215:8, ECF No. 123-1. After raising his allegations, his feedback changed. *Id.*

### c. Unwanted physical contact

Beginning on May 15, 2013, when Mr. Sandoval discovered that Plaintiff was gay, and again on May 21, 2013, Mr. Sandoval touched and rubbed Plaintiff's back, despite Plaintiff repeatedly telling him to stop. *See* Verified Am. Compl. ¶ 175, ECF No. 52. On May 24, 2013, Mr. Sandoval put his hands on Plaintiff, and when Plaintiff yelled and told him never to touch him again, Mr. Sandoval laughed and left the office. *Id.* ¶ 178.

On May 25, 2013, Plaintiff reported to Ms. Pinto that, after discovery that Plaintiff was gay, Mr. Sandoval had begun touching and rubbing Plaintiff, that this was unwelcome, that Plaintiff had repeatedly told Mr. Sandoval to stop, Mr. Sandoval dismissed his objections, and

Mr. Sandoval had continued to an extent that was becoming sexual harassment. *Id.* ¶ 183. Plaintiff told Ms. Pinto that Mr. Sandoval's complaints to her about Plaintiff were being exaggerated in retaliation for these and other objections Plaintiff had voiced during his employment. *Id.* Ms. Pinto ignored his concern and made no direct response. *Id.* In this same conversation, Plaintiff reminded Ms. Pinto about all the patients he had seen from Dr. Shafer with either work billed and not done or work that needed to be redone. *Id.* ¶ 185.[5]

### d. Plaintiff's disability and service dog in training

Plaintiff has Generalized Anxiety Disorder and a history of PTSD. *See* Dep. of Kelly Coleman 54:18-55:17, 56:9-57:11, 61:6-17, 90:19-92:24, ECF No. 123-2; Letter from Dr. Kelly Coleman, ECF No. 123-2 at 21 of 21. Plaintiff's licensed clinical psychologist, Dr. Kelly Sueoka Coleman, recommended he address the symptoms of his anxiety disorder using a service dog to help alleviate some of his anxiety. *See* Dep. of Kelly Coleman 17:12-13, 57:6-59:3, 74:17-75:3, 80:12-22, 90:19-92:24, ECF No. 123-2; Letter from Kelly Coleman, ECF No. 123-2 at 21 of 21. Plaintiff had a dog Boscoe, a large St. Bernard, who was a service dog in training. Decl. of Dr. Hernandez-Gil ¶ 7, ECF No. 123-3; Dep. of Dr. Hernandez-Gil 118:3-119:9, ECF No. 112-7; Dep. of Kelly Coleman 77:25-78:3, ECF No. 123-2. Dr. Coleman specifically had numerous conversations recommending Plaintiff use Boscoe as a service dog to help him with his general anxiety he experienced all the time. *See* Dep. of Kelly Coleman 58:10-59:3, 74:14-75:3, 77:2-78:19, 80:1-22, ECF No. 123-2. By letter dated September 10, 2012, Dr. Coleman recommended to the Office of Disability for Service Dogs a request for a service animal for Dr. Hernandez-Gil. Letter from Dr. Kelly Coleman, ECF No. 123-2 at 21 of 21. Boscoe had not completed his certification process and would not complete his training until up to a year after May 2013. *See*

---

[5] Defendants dispute all these allegations of unwanted physical contact and reports thereof. *See*, *e.g.*, Aff. of Clint Sandoval ¶ 24, ECF No. 112-4. Nevertheless, the Court must view the facts in Plaintiff's favor at this stage of the litigation.

Dep. of Dr. Hernandez-Gil 118:3-119:9, ECF No. 112-7.

Plaintiff needed and used Boscoe as a service dog to assist during his commute to the Atrisco clinic and to help him with his panic attacks, should one arise. Dep. of Dr. Hernandez-Gil 202:7-203:9, 219:6-221:5, ECF No. 123-1, and 222:13-25, ECF No. 112-7. Boscoe was able to give Plaintiff cues that he was going to have a panic attack. *See id.* 220:3-222:25, ECF No. 112-7. Even if Boscoe were in another room, if Plaintiff could see him, Boscoe could give him cues of a panic attack, so Plaintiff could go to Boscoe, whose presence could alleviate his symptoms. *See id.*

Family Smiles' Employee Handbook states that pets are prohibited from all offices, but "[s]ervice animals are not considered pets." Decl. of Dr. Hernandez-Gil, Attachment B, ECF No. 123-3 at 12 of 12. Plaintiff disclosed his disability to Ms. Pinto on May 13 and 14, 2013. *See* Verified Am. Compl. ¶¶ 348-49, ECF No. 52. He stated that his dog Boscoe has trained responses to and alleviates his symptoms when present. *See id.* ¶ 349.

On May 24, 2013, Plaintiff also told Mr. Sandoval that Boscoe helped alert to and helped him work through his panic attacks, such as when driving. *See* Verified Am. Compl. ¶ 349, ECF No. 52. On May 24 or 25, 2013, Plaintiff told Ms. Pinto of his intention to bring Boscoe, who he said was a service dog, and put him in the office. *See* Dep. of Dr. Hernandez-Gil 195:24-196:21, 201:3-202:6, ECF No. 123-1. Ms. Pinto told him that he could not use the office because too many people use the office, and he needed to have a cage for Boscoe. *See id.* 197:7-9, 199:5-22. Plaintiff indicated that Boscoe could be put in a cage and was crate-trained but that Boscoe needed to be where he could see him. *Id.* 218:2-14. Ms. Pinto said that they could talk about it later because it did not have to happen now. *Id.* 199:18-22. Plaintiff understood that the issue of the cage was still open and not definite. *See id.*

At some point, Ms. Pinto proposed housing Boscoe in a back office. *See id.* Plaintiff, however, believed that a cage in a back room was impractical because he would not be able to see Boscoe, and visual contact with his dog was helpful because the dog could signal to him that a panic attack was coming. *See* Dep. of Dr. Hernandez-Gil 199:5-200:11, ECF No. 112-7, and 223:4-224:6, ECF No. 123-1. He pointed out that people did not use the office he preferred in the way she said it was used. *See id.* 201:3-12, ECF No. 112-7.

On Monday, May 27, 2013, Plaintiff first brought Boscoe to work and placed him in the clinic's only office, one which was seldom used by Family Smiles' personnel, and put up a gate in the office doorway, one which easily opened with a handle. *See* Dep. of Dr. Hernandez-Gil 197:13-198:9, 201:8-202:6, ECF No. 123-1. Plaintiff did not bring a cage. *Id.* 197:13-16. Boscoe was well-groomed and well-behaved. Decl. of Dr. Hernandez-Gil ¶ 8, ECF No. 123-3. While in the office on May 27-28th, Boscoe slept and did not actively perform functions as a service dog, but his presence in the clinic helped Plaintiff because, if he were to start having a panic attack, Boscoe could help calm him. *See* Dep. of Dr. Hernandez-Gil 170:6-17, ECF No. 112-7, and 219:6-221:5, 123-1.

On May 27, 2013, Ms. Pinto came to the clinic with Ann Patrone, Special Projects Manager. Verified Am. Compl. ¶¶ 186, ECF No. 52. Ms. Pinto chastised Plaintiff for not bringing a cage for Boscoe. *Id.* Plaintiff responded that he had never agreed to bring a cage because it was impracticable, but that they had bigger problems because he had seen yet another patient of Dr. Shafer for which work was billed and not done. *Id.* Plaintiff stated that the Network needed to do an audit or someone had to report it to Medicaid. *Id.* Ms. Pinto walked away. *Id.* Later that day, Plaintiff again reported to Ms. Pinto and Ms. Patrone that Dr. Shafer billed for work not done and that they had to do an audit because by law they had to report this to

Medicaid. *Id.* ¶ 187.

### e. Plaintiff's Termination from Family Smiles

On May 28, 2013, Plaintiff brought Boscoe into the office again. Dep. of Dr. Hernandez-Gil 209:9-12, ECF No. 123-1. At around 2 p.m., Khurram Hussain and Juliette Boyce called via Skype Ann Petrone and Clint Sandoval. Pl.'s Resp. Ex. 4, ECF No. 123-4 at 2 of 7. They spoke before bringing Plaintiff into the call. *See id.*

Mr. Sandoval told Plaintiff he had to have a Skype meeting with Khurram Hussain and asked Plaintiff if he could get Boscoe out of the room. Dep. of Dr. Hernandez-Gil 209:9-23, ECF No. 123-1. Plaintiff left with Boscoe and stood outside the open door. *Id.* 209:24-210:1. Khurram Hussain asked Mr. Sandoval if there was "some fucking dog in the clinic," and Mr. Sandoval responded yes. *Id.* 210:2-8. Mr. Sandoval brought Plaintiff into the room and Mr. Hussain told him that he had federal, state, and local laws he had to adhere to and health laws and he could not allow a companion dog in the office, one that he needed only for companionship on the drive to the office. *See id.* 211:2-13. Plaintiff responded that Boscoe was a service dog in training and that he could provide documentation. *Id.* 211:14-16. Mr. Hussain responded that he did not need to see any documentation, he must leave the dog at home, and if he brought him to work the next day, he will be fired. *Id.* 211:16-21. Plaintiff replied that he would bring him tomorrow because he is a service dog and that he could provide the paperwork. *Id.* 211:21-23. Mr. Hussain said he was satisfied he is a companion dog, that he is to stay at home or he would be fired. *Id.* 211:23-25. Plaintiff repeated that he's coming here tomorrow, and Mr. Hussain said, "[F]ine, then you're fired. I will send you paperwork stating that." *Id.* 211:25-212:2.

By letter dated May 28, 2013, Peter Stathakis informed Plaintiff: "Pursuant to our executed agreement, Section Fourteen (14), Family Smiles, LLC is hereby issuing you formal

notice of immediate termination. This termination is issued the 28th day of May, 2013 and will be effective immediately." Defs.' Ex. 8, ECF No. 112-8. Mr. Stathakis, the Secretary of Family Smiles and the Chief Financial Officer of Dental Experts and KOS, signed the letter. *See id.*; Answer ¶¶ 22, 27, ECF No. 56 at 13, 16 of 112. Section 14 of the Employment Agreement permitted termination for a variety of reasons including "[i]n the event Dentist conducts himself/herself, either personally or professionally, in a manner that FSL deems inconsistent with or detrimental to achieving the business and professional goals of FSL," and "[i]f Dentist has breached the terms of this Agreement." Employment Agreement § 14, ECF No. 112-1. The Employment Agreement required Plaintiff to provide dental services "in a professional and courteous manner." *Id.* § 1.

No patients ever complained to Plaintiff about his care or manner; nor did anyone at Family Smiles inform him of patient complaints against him while he was working there. *See* Dep. of Dr. Hernandez-Gil 203:10-24, ECF No. 123-1. Plaintiff never raised his voice with staff or patients. *Id.* 203:25-204:14.[6]

### f. Dr. Moffat's Review of Family Smiles' Dental Records

Dr. Ryan Moffat is a Board Certified Pediatric Dentist, who Plaintiff hired as an expert witness to review the billings to Medicaid made by Dr. Shafer while employed at Family Smiles. Report of Dr. Moffat 1-2, ECF No. 111-1. Dr. Moffat analyzed chart notes, radiographs, and billing statements for all patients seen by Dr. Shafer during the time of his employment. *Id.* at 3.[7]

---

[6] Defendants have submitted evidence of patient and staff complaints against Plaintiff. Plaintiff, however, refutes those facts through his own sworn, admissible testimony. Moreover, Plaintiff asserts that the only documentary evidence of patient complaints was created on May 30, 2013, after he was fired, supporting an inference that the allegation of patient complaints was created after-the-fact to justify his termination. The Court must construe the evidence and all reasonable inferences to be derived therefrom in favor of Plaintiff at this stage. Accordingly, for purposes of this motion, the Court must view the evidence favorably toward Plaintiff that he was not rude or unprofessional with patients or staff.

[7] Defendants assert there is no evidence that Dr. Shafer prepared office records, but they admit "Dr. Shafer contributed to the content of certain patient charts, and some of the treatments he charted were billed to the New

Dr. Moffat studied the dental charts of approximately 1,325 patients seen by Dr. Shafer over the course of about 18 months. *Id.* at 7. Of those 1,325 patients, Dr. Moffat found no problems with the billings for approximately 789 patients. Dep. of Dr. Moffatt 50:5-25, ECF No. 111-2. For 212 patients, Dr. Moffat could not form an opinion based on the evidence of whether there were false or fraudulent claims submitted regarding their care. *Id.* 51:7-52:6. Dr. Moffat thus found that approximately 1,001 patients of the 1,325 either did not have billing problems or he could not form an opinion that there were billing problems. *See id.* 51:7-52:19.

Dr. Moffat opined that he discovered billing problems with 324 patients, some of whom had billing issues in both "Category A" restorations and "Category B" restorations. *See id.* 52:15-53:20. Dr. Moffat defined "Category A" restorations as those said to have been completed and billed for, but as to which Dr. Moffat's examination of follow-up x-rays showed no evidence of restorations having been done. *Id.*; Report of Dr. Moffat 3, ECF No. 111-1. He defined "Category B" restorations as those said to have been completed and billed for as more expensive fillings, but as to which Dr. Moffat's examination of follow-up x-rays showed were not truly fillings, but should have been billed as less expensive sealants or Preventative Resin Restorations. *See* Report of Dr. Moffat 3, 5, ECF No. 111-1. In 324 patient records, Dr. Moffat concluded Dr. Shafer falsely billed for 332 Category A restorations and 1,487 Category B restorations. *See id.* at 3-5. As used in his report, Dr. Moffat understood that "false" indicates error while "fraudulent" indicates intent associated with a billing error to bill things incorrectly for some type of personal gain. *See* Dep. of Dr. Moffat 39:3-5, 40:9-13, ECF No. 111-2. Dr. Moffat calculated approximately $91,251 in the total amount billed falsely for Category A and Category B restorations. *See* Report of Dr. Moffat 4-5, ECF No. 111-1.[8]

---

Mexico Medicaid program." Defs.' Reply, Ex. A at 1, ECF No. 127-1.

[8] Defendants have moved to exclude the testimony of Dr. Moffat that Dr. Shafer acted with fraudulent intent when

## 2. STANDARD

On a motion for summary judgment, the moving party initially bears the burden of showing that no genuine issue of material fact exists. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial. *Id.* The nonmoving party must go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party." *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (internal quotations omitted). Only disputes of facts that might affect the outcome of the case will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *See id.* at 248.

## 3. ANALYSIS

### a. False Claims Act and New Mexico Analogous Claims (Counts 1-12)

Plaintiff brought claims under the False Claims Act ("FCA"), 31 U.S.C. § 3729-3731, New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §§ 27-14-1 et seq. ("MFCA"), and the New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. §§ 44-9-1 et seq. (2007) ("FATA") against all Defendants. In his response, however, Plaintiff stated he "is not pressing claims under the FCA or its New Mexico counterparts against any of Defendants other than Family Smiles." Pl.'s Resp. 23 n.7, ECF No. 123. The Court will therefore dismiss the FCA, MFCA, and FATA

---

he submitted the identified incorrect billings. The Court addresses that motion *infra*. Defendants, however, have not sought to exclude Dr. Moffat's testimony concerning the errors he purportedly discovered regarding Category A and B restorations.

claims in Counts 1-12 against Defendants Dental Dreams, LLC a.k.a. Dental Experts, LLC, an Illinois LLC; Sameera Hussain; Dental Dreams, LLC, a New Mexico LLC; Frank Von Westernhagen; KOS Services, LLC; and Khurram Hussain. The Court will therefore turn to the merits of these claims against Defendant Family Smiles.

### (1) False Claims (Counts 1-12)

"FATA closely tracks the longstanding federal False Claims Act." *State ex rel. Foy v. Austin Capital Management, Ltd.*, 2015-NMSC-025, ¶ 25, 355 P.3d 1. New Mexico state courts have also looked to federal precedent construing the FCA to provide guidance on the MFCA. *State ex rel. King v. Behavioral Home Care, Inc.*, 2015-NMCA-035, ¶ 17, 346 P.3d 377. Under the FCA, FATA, and MFCA, the plaintiff must show that the false claims were presented to the government knowingly. *See* 31 U.S.C. § 3729(a)(1)(A), (B), and (G) (FCA); N.M. Stat. Ann. § 27-14-4(A), (C), (E); and N.M. Stat. Ann. § 44-9-3(A)(1), (2), (3), (8), and (9). According to the FCA, "knowing" and "knowingly"

> (A)     mean that a person, with respect to information—
>
>          (i) has actual knowledge of the information;
>          (ii) acts in deliberate ignorance of the truth or falsity of the information; or
>          (iii) acts in reckless disregard of the truth or falsity of the information; and
>
> (B)     require no proof of specific intent to defraud.

31 U.S.C. § 3729(b)(1). *See also* N.M. Stat. Ann. § 44-9-3(B) ("Proof of specific intent to defraud is not required for a violation of Subsection A of this section."). It is therefore not enough to submit a false claim; the relator must show that the defendant knowingly presented or submitted a false claim for payment. *United States v. The Boeing Company*, 825 F.3d 1138, 1148-49 (10th Cir. 2016). A claim is false under the FCA if a payee either submits an incorrect description of the goods or services provided or requests reimbursement for goods or services

never provided. *Id.* at 1148. "A defendant's reasonable interpretation of any ambiguity inherent in the regulations belies the scienter necessary to establish a claim of fraud." *United States ex rel. Miller v. Weston Educational, Inc.*, 840 F.3d 494, 500 (8th Cir. 2016) (internal quotations omitted). If a relator succeeds on an FCA claim, the defendant is liable to the Government for a civil penalty between $5,000 and $10,000 for each violation (adjusted for inflation), treble damages, and costs, and the relator shares in the recovery. *See Cook County, Ill. v. U.S. ex rel. Chandler*, 538 U.S. 119, 123 & n.1 (2003) (citing 31 U.S.C. §§ 3730(b) & (d), 3729(a)).

Defendants first argue that there is no evidence that Dr. Shafer knowingly submitted false claims. Defendants have submitted the declaration of Dr. Shafer in which he averred that he never performed any dental treatment or procedure that he believed was unnecessary or not in a patient's best interests, or that he believed was below the standard of care. Decl. of Dr. Shafer ¶ 5, ECF No. 112-2. Dr. Shafer also stated that he never knowingly documented dental treatments that he did not actually perform and never knowingly documented sealants as fillings. *Id.* ¶ 6. Because the Court must view all inferences at this stage in favor of Plaintiff, the Court finds that the testimony of Dr. Moffat concerning the large number of Category A and Category B restoration billing errors is sufficient evidence from which a jury may infer that, contrary to his declarations, Dr. Shafer knowingly, rather than mistakenly, charted and documented dental treatments that he did not actually perform and knowingly documented sealants as fillings in those instances in Dr. Moffat's reports. The Court therefore finds that Dr. Shafer's intent when he charted incorrect billings that were submitted to Medicaid and whether he engaged in false or fraudulent billing practices are disputed facts for the jury to decide.

Defendants next argue that, even if there is a question of fact as to Dr. Shafer's knowledge, his purported knowledge is not sufficient to establish knowledge of Family Smiles.

Plaintiff contends, however, that under the FCA, FATA, and MFCA, an employee's knowledge is imputed to the employer. Both parties agree that the Tenth Circuit has not yet directly addressed this issue.

Defendants assert that the Tenth Circuit has suggested that knowledge of management is necessary to establish vicarious liability for false claims, citing *Shaw v. AAA Engineering & Drafting, Inc.*, 213 F.3d 519, 534 n.18 (10th Cir. 2000). In a footnote, the Tenth Circuit rejected an argument by the defendants that they could not be held liable for false claims resulting from a failure to practice silver recovery because management did not know of the failure. *Id.* The Tenth Circuit merely concluded that the evidence showed management did know about the failure, so the case cannot be read to establish one way or the other the Tenth Circuit's view on what is necessary to impute a non-managerial employee's knowledge to an employer in the absence of evidence the employer knew of its employee's actions. *See id.*

Turning to out-of-circuit authority, Defendants rely on a district court case from Maryland holding that a corporate employer may be vicariously liable under the FCA for the misdeeds of a low-level employee who caused false claims to be filed without the knowledge or consent of her employer only if some degree of culpability can be ascribed to the employer. *See United States v. Southern Maryland Home Health Services*, 95 F.Supp.2d 465, 466 (D. Md. 2000). The district court held "that, at least when the recovery sought by the Government is substantially higher than its actual losses, an employer is *not* vicariously liable under the FCA for wrongful acts undertaken by a non-*managerial* employee unless the employer had knowledge of her acts, ratified them, or was reckless in its hiring or supervision of the employee." *Id.* at 468 (italics in original). The district court's analysis was based on its determination that the Government was essentially seeking punitive damages in the case where it sought well over a

million dollars for only about $60,000 in actual losses. *See id.* at 469-73. The *Southern Maryland* court relied on *Kolstad v. American Dental Assoc.*, 527 U.S. 526 (1999), in which the Supreme Court applied common law principles of agency in a Title VII case to hold that an employer may not be vicariously liable for punitive damages based solely on the employee's apparent authority or acts committed within the scope of her employment. *See id.* at 469-70. The district court used the Restatement of Agency's "strict limitations" on the application of vicarious liability for punitive damages, requiring evidence that the principal authorized the wrongful act or was reckless in hiring or supervising the agent, that the agent acted in a managerial capacity within the scope of employment, or the principal or a managerial agent ratified the wrongful acts. *Id.* at 470.

The *Southern Mary*land court recognized that its holding was based on the assumption that FCA damages are punitive in nature and distinguished *American Society of Mechanical Engineers v. Hydrolevel Corp.*, 456 U.S. 556 (1982) ("ASME"), in which the Supreme Court applied the apparent authority theory to bind an employer in an anti-trust case under a statute providing for treble damages. *See id.* at 471-72. The Supreme Court in *ASME* stated: "[A] principal is liable for an agent's fraud though the agent acts solely to benefit himself, if the agent acts with apparent authority." *ASME*, 456 U.S. at 566. The *Southern Maryland* court determined that *Kolstad* limited the reach of *ASME* and that *ASME* was based on the goals of the antitrust statutes, noting that the FCA was comparatively more punitive. *Southern Maryland*, 95 F.Supp.2d at 472.

After *Southern Maryland*, the Supreme Court held that the term "person" in § 3729 of the FCA included local governments. *Cook County*, 538 U.S. at 134. The County had argued that Congress's adoption of a "punitive" remedy in the form of increased fines and treble damages in

its amendments to the FCA suggested that it did not intend to cover municipalities. *See id.* at 129-30. In rejecting this argument, the Supreme Court explained:

> Although we did indeed find the punitive character of the treble damages provision a reason not to read "person" to include a State, it does not follow that the punitive feature has the force to show congressional intent to repeal implicitly the existing definition of that word, which included municipalities. To begin with it is important to realize that treble damages have a compensatory side, serving remedial purposes in addition to punitive objectives. While the tipping point between payback and punishment defies general formulation, being dependent on the workings of a particular statute and the course of particular litigation, the facts about the FCA show that the damages multiplier has compensatory traits along with the punitive.

> …The most obvious indication that the treble damages ceiling has a remedial place under this statute is its *qui tam* feature with its possibility of diverting as much as 30 percent of the Government's recovery to a private relator who began the action. In *qui tam* cases the rough difference between double and triple damages may well serve not to punish, but to quicken the self-interest of some private plaintiff who can spot violations and start litigating to compensate the Government, while benefiting himself as well.

*Id.* at 130-31 (internal citations omitted).

In light of the Supreme Court's discussion of the compensatory traits of the FCA's damages provision, this Court is not convinced that the *Southern Maryland* court's reasoning remains sound. Moreover, the district court in *Southern Maryland* acknowledged the considerable authority that then-existed in the FCA context imposing vicarious liability on employers, even if the employee's actions did not benefit the employer, when the employee is acting within the scope of employment or with apparent authority. 95 F.Supp.2d at 467-68 (citing cases). Plaintiff relies on this contrary authority to support his position that Family Smiles may be held vicariously liable for Dr. Shafer's actions.

The purposes of the FCA are to make the government whole and deter fraud against it. *United States v. O'Connell*, 890 F.2d 563, 568 (1st Cir. 1989). The First Circuit, relying on *ASME*, concluded that the purposes of the FCA are served by imposing vicarious liability on an

employer in order to deter violations and to protect the public. *See id.* at 567-69 (imputing liability to the corporation based on the acts of its general manager and one-third owner, even though manager's acts did not benefit the corporation). The Court finds the reasoning more persuasive in the majority of cases holding an employer vicariously liable whenever its employees act within the scope of employment or with apparent authority, regardless of the employer's knowledge or culpability, because it is more consistent with the purpose of the FCA to protect the property of the government. *See*, *e.g.*, *O'Connell*, 890 F.2d at 569 ("We hold that a corporation should be held liable under the False Claims Act for the fraud of an agent who acts with apparent authority even if the corporation received no benefit from the agent's fraud."); *Grand Union Co. v. United States*, 696 F.2d 888, 890–91 (11th Cir. 1983) (holding that knowledge would only be imputed to employer if employee acted within scope of employment and with purpose of benefitting employer); *United States v. Hangar One, Inc.*, 563 F.2d 1155, 1158 (5th Cir. 1977) (holding that liability of corporation for FCA violation may arise from conduct of employees other than those with substantial authority and broad responsibility if employees were acting within scope of employment and for the purpose of benefitting corporation). *See also In re ChinaCast Educ. Corp. Securities Litigation*, 809 F.3d 471, 476-78 (9th Cir. 2015) (relying on *ASME* in part in imputing scienter of senior level employee to corporate employer for federal securities law violations where employee acted within scope of apparent authority). Under the facts construed in favor of Plaintiff, a reasonable jury could conclude that Dr. Shafer acted within the scope of his employment and/or with apparent authority, as well as for the benefit of Family Smiles.[9]

---

[9] The circuits applying vicarious liability are split on whether the doctrine applies only where the corporation received a benefit, at least in part. *See O'Connell*, 890 F.2d at 568 (discussing split in authority). The parties have not argued whether a corporate benefit is required for liability, but the Court need not resolve that issue now, because at this stage, Plaintiff's evidence indicates that Family Smiles benefited from the submission of the

Finally, Defendants argue that there is no evidence that other managers knew of purported problems with Dr. Shafer's billing practices at the time Dr. Shafer worked there. Plaintiff's alleged notification occurred well after Dr. Shafer had left. Defendants contend that knowledge allegedly acquired by managers after claims were submitted is irrelevant to whether purportedly false claims for treatments by Dr. Shafer were made knowingly. Defendants, however, cite no legal authority for this proposition. In light of the law on vicarious liability, the Court is not convinced the purported timing problem arising from the fact that Dr. Shafer no longer worked for Family Smiles when Plaintiff notified managers of the purported false billing precludes liability. For all the foregoing reasons, Defendant Family Smiles is not entitled to summary judgment on the FCA, FATA, and MFCA claims.[10]

### (2) Reverse False Claims (Counts 3, 6, 10-12)

Section 3729(a)(1)(G) provides liability to the United States Government for any person who

> knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1)(G). "Section 3729(a)(1)(G) is known as the 'reverse false claims' section of the FCA, because it targets a defendant's 'fraudulent effort to reduce a liability owed to the government rather than to get a false or fraudulent claim allowed or paid.'" *United States v. Simparel, Inc.*, Civ. Action No. 13-2415, 2015 WL 7313861, at *4 (D.N.J. Nov. 20, 2015) (quoting *U.S. ex rel. Atkinson v. PA. Shipbuilding Co.*, 473 F.3d 506, 514 n.12 (3d Cir. 2007)). The parties agree that to establish liability on a reverse false claims act cause of action a plaintiff

---

purported false claims of Dr. Shafer.
[10] Moreover, even if some culpability on the part of the employer is required to establish vicarious liability, a question of fact exists in this case as to whether Family Smiles' management knew of and ratified Dr. Shafer's conduct. *See* discussion *infra*.

must prove (1) there is an obligation to pay or transmit money or property, (2) to the Government, which the defendant (3) knowingly and improperly (4) avoided or decreased. *See* 31 U.S.C. § 3729(a)(1)(G). *See also* N.M. Stat. Ann. § 27-14-4(E) (making it unlawful for person to conceal, avoid, or decrease an obligation to pay or transmit money or property to State related to Medicaid); N.M. Stat. Ann. § 44-9-3(A)(9) (FATA penalizes "a beneficiary of an inadvertent submission of a false claim [who] having subsequently discovered the falsity of the claim, fail[s] to disclose the false claim to the state or political subdivision within a reasonable time after discovery"). The parties disagree, however, as to the meaning of "obligation."

The FCA defines the term "obligation" as "an established duty, whether or not fixed, arising … from the retention of any overpayment." 31 U.S.C. § 3729(b)(3) (2009). The regulations for reporting and returning overpayments state:

> A person has identified an overpayment when the person has, or should have through the exercise of reasonable diligence, determined that the person has received an overpayment and quantified the amount of the overpayment. A person should have determined that the person received an overpayment and quantified the amount of the overpayment if the person fails to exercise reasonable diligence and the person in fact received an overpayment.

42 C.F.R. § 401.305(a)(1). A person who has received an overpayment must report and return it to the Health and Human Services Secretary, the State, or other appropriate entity within "60 days after the date on which the overpayment was identified." 42 U.S.C. § 1320a-7k(d)(2)(A); 42 C.F.R. § 401.305(b)(1)(i). "Any overpayment retained by a person after the deadline for reporting and returning the overpayment specified in paragraph (b) of this section is an obligation for purposes of 31 U.S.C. 3729." 42 C.F.R. § 401.305(e).

Defendants argue that no "obligation" arises until the provider has "identified" the overpayment, in other words, until the provider has quantified a specific overpayment relating to a specific claim. Defendants assert there is no evidence that any employee determined there were

overpayments arising from treatments by Dr. Shafer. Plaintiff contends that, even assuming "identification" is a required element, the element is satisfied by showing that the person "fail[ed] to exercise reasonable diligence and the person in fact received an overpayment."

Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Family Smiles received an overpayment. *See* discussion of Dr. Moffat testimony *supra*. The failure to exercise reasonable diligence question is much closer. Dr. Hernandez-Gil's declaration states (i) he informed Ms. Pinto and Mr. Sandoval about false billing practices; (ii) Mr. Sandoval replied that Ms. Pinto, Sameera Hussain and Khurram were all aware of the practices, yet Sameera and Khurram would not allow an investigation or audit into the fraudulent billing because it would cost too much money; (iii) Mr. Sandoval explained that the company used employment contracts in which dentists could not leave the company without giving notice a very significant period of time in advance, provisions the company would use to force the dentists that wanted to leave sooner to meet certain performance goals to gain an early release; and (iv) Mr. Sandoval said that performance goals were so high that they virtually required fraud be committed by those dentists. Viewing every inference in Plaintiff's favor, as the Court must, a jury could infer from this evidence that Family Smiles management knew it received overpayments and took no steps to investigate, quantify, report, or return the overpayments. *Cf. United States v. Crumb*, CIVIL ACTION 15-0655-WS-N, 2016 WL 4480690, at \*17 (S.D. Ala. Aug. 24, 2016) (refusing to dismiss reverse false claim count where complaint alleged that defendants had actual knowledge of improper claim submissions and attendant overpayments by no later than 2010, yet failed to conduct any investigation or make any repayment at all (and even then, nothing more than partial repayment) until June 2015).

Finally, Defendants argue that Plaintiff has no evidence that they acted "improperly,"

which they define as acting in a way that was inherently tortious, illegal, or *malum in se*. Again, if the jury finds Plaintiff's evidence credible, it could conclude that Family Smiles managers knew Family Smiles received overpayments from Dr. Shafer's false billing and failed to return and report the overpayments, thus improperly avoiding repaying the Government, in violation of 42 U.S.C. § 1320a-7k(d)(1). For all the foregoing reasons, the Court will deny summary judgment to Defendant Family Smiles on the reverse false claims counts.

### b. Burden-Shifting Claims

A plaintiff who lacks direct evidence of intentional discrimination under the ADA, Title VII, and NMHRA and who lacks direct evidence of retaliatory intent may submit circumstantial evidence using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Harrington v. Aggregate Industries Northeast Region, Inc.*, 668 F.3d 25, 31 (1st Cir. 2012) (apply *McDonnell Douglas* analysis to retaliation claims under FCA); *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1192 (10th Cir. 2000) (Title VII). *See also DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 968-69 (10th Cir. 2017). The critical inquiry is whether the plaintiff has demonstrated that the termination occurred under circumstances giving rise to an inference of unlawful discrimination or of unlawful retaliation. *DePaula*, 859 F.3d at 970; *U.S. ex rel. Schweizer v. Oce N.V.*, 677 F.3d 1228, 1237-38 (D.C. Cir. 2012) (FCA retaliation). If a plaintiff establishes a prima facie case of discrimination or retaliation, the burden of production shifts to the defendant to offer a legitimate, non-discriminatory rationale for the adverse employment action. *DePaula*, 859 F.3d at 970; *Horizon*, 220 F.3d at 1191; *Schweizer*, 677 F.3d at 1241. "The defendant's burden is exceedingly light, as its stated reasons need only be legitimate and non-discriminatory on their face." *DePaula*, 859 F.3d at 970 (internal quotations and citations omitted). The defendant's burden is one of

production, involving no credibility assessments, and is met if the defendant provides admissible evidence of a legally sufficient explanation for the employment action that raises a genuine issue of material of fact as to whether the defendant discriminated against the plaintiff. *Id.*

If the defendant meets its burden of articulating a facially non-discriminatory reason for the adverse action, the plaintiff must show that the defendant's proffered rationale is pretextual by a preponderance of the evidence. *Id.*; *Horizon*, 220 F.3d at 1191. Pretext can be shown through evidence of weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered reasons that a reasonable jury could rationally find to be unworthy of credence or through evidence that the employer acted contrary to a policy or practice when making the adverse employment decision. *See DePaula*, 859 F.3d at 970. The court does "not ask whether the employer's reasons were wise, fair or correct; the relevant inquiry is whether the employer honestly believed its reasons and acted in good faith upon them." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1118-19 (10th Cir. 2007). Although the court must construe all facts favorably to Plaintiff, in evaluating pretext arguments, the court must consider the facts as they appeared to decision-makers. *Bennett v. Windstream Communications, Inc.*, 792 F.3d 1261, 1268 (10th Cir. 2015).

### (1) Retaliation Claims under the FCA, MFCA, and FATA (Counts 13-15)

In his response, Plaintiff states that he is now only pursuing his retaliation claims in Counts 13-15 against Defendants "Family Smiles, Khurram Hussain, Dental Dreams a.k.a. Dental Experts, LLC, and KOS Services." Pl.'s Resp. 18 n.2. The Court will therefore dismiss Counts 13-15 against Defendants Sameera Hussain; Dental Dreams, LLC, a New Mexico limited liability company; and Frank Von Westernhagen, and turn to the merits of this claim against the remaining defendants.

The FCA provides whistleblower protections for an employee who is terminated, threatened, harassed, or otherwise discriminated against in the terms and conditions of his employment because of a lawful act taken "in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1) (2012) (as amended effective May 2009). To state an FCA retaliation claim, a plaintiff must show (1) he took action in furtherance of an FCA enforcement action, (2) his employer had notice that he was taking action in furtherance of a private qui tam action or assisting the government in bringing an FCA action; and (3) he was discharged or discriminated against because of the protected conduct. *See McBride v. Peak Wellness Center, Inc.*, 688 F.3d 698, 704 (10th Cir. 2012). The MFCA and FATA contain similar anti-retaliation provisions. *See* N.M. Stat. Ann. § 27-14-12, § 44-9-11(B).

An employee does not need to have filed a qui tam action for whistleblower protection. *McBride*, 688 F.3d at 704. Notice that informs the employer merely of regulatory violations without giving a suggestion that the plaintiff is going to report the non-compliance is insufficient. *Id.* On the other hand, notice may be satisfied by informing the employer that its illegal activities constitute fraud on the United States, by warning the employer of regulatory noncompliance and false reporting of information to a government agency, or by explicitly informing the employer of an FCA violation. *Id.*

In this case, Plaintiff avers he reported the fraudulent billing practices of Dr. Shafer to Mr. Sandoval, the Atrisco Office manager, to Edith Pinto, the Regional Manager of the New Mexico clinics, and to Ann Patrone, Special Projects Manager. *See* Decl. of Dr. Hernandez-Gil ¶¶ 10-16, ECF No. 123-3; Verified Compl. ¶¶ 186-87. According to Plaintiff, he specifically used the word "fraud" and "illegal" and discussed the need for an investigation or audit. *See*

Decl. of Dr. Hernandez-Gil ¶¶ 17-18, ECF No. 123-3. When Mr. Sandoval told Plaintiff that the company wanted him to do the missing work and fill out a form, Plaintiff said the company's response was inadequate in law and it must report it and do an audit. *Id.* ¶ 25. This evidence is not merely of a passing reference of a regulatory violation, but rather, indicates repeated attempts to notify management of an FCA violation and to have them conduct an audit and report it, creating questions of fact as to whether Plaintiff took action in furtherance of a qui tam action and whether his employer had notice of Plaintiff's protected conduct.

Defendants additionally assert that the causation element cannot be satisfied because Plaintiff has no evidence that Khurram Hussain, who fired Plaintiff, knew of Plaintiff's reports of fraudulent acts and the need for an audit. To satisfy the causation element, a plaintiff must demonstrate that the person who took the adverse action against him knew of the employee's protected activity, or that the person allegedly harboring the discriminatory animus knew and used the person who effected the adverse action as the "cat's paw" to affect his own discriminatory designs. *Cf. Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007) (Title VII). Temporal proximity between protected activity and the adverse action may permit an inference of causation. *Hysten v. Burlington Northern and Santa Fe Ry. Co.*, 296 F.3d 1177, 1183-84 (10th Cir. 2002).

Plaintiff submitted evidence that he reported the fraud to Mr. Sandoval, Ms. Pinto, and Ms. Patrone; Mr. Sandoval told him that "the company" wanted him to do the missing work, fill out a form, and allow his production to be credited with the work; and that on two occasions, he filled out forms reporting falsely certified work, which were pre-addressed to Defendant Sameera Hussain. *See* Decl. of Dr. Hernandez-Gil ¶¶ 10-27, ECF No. 123-3. Mr. Sandoval and Ms. Patrone were part of the conversation in which Mr. Hussain fired Plaintiff. Plaintiff reported

the fraudulent activity within days of being fired – a very close connection in time. Again, this is a close evidentiary issue, but viewing all the evidence and the inferences to be derived therefrom in favor of Plaintiff, a jury may infer that Mr. Hussain was aware of Plaintiff's reports of Medicaid fraud or that Mr. Sandoval or Ms. Patrone affected the firing because of Plaintiff's repeated reports of Medicaid fraud.

Defendants argue that the evidence conclusively establishes that Plaintiff was fired for insisting on bringing his dog to work and for unprofessional behavior, not for attempting to further an FCA action. Although Defendants have met their burden of production in showing a reason for firing Plaintiff apart from retaliation, as discussed in more detail below, questions of fact exist for a jury's determination as to whether Defendants' reason for firing Plaintiff over Boscoe was legitimate or if it was pretextual. The timing of Plaintiff's firing, within days of his raising issues of government fraud to managers, is evidence of pretext sufficient to send the issue to a jury for resolution. *Cf. Foster v. Mountain Coal Co.*, 830 F.3d 1178, 1191 (10th Cir. 2016) ("Because the purported protected activity here occurred mere days or even hours before the adverse employment action, we conclude that Foster can show causation at the prima facie stage solely with evidence of temporal proximity."); *Schweizer*, 677 F.3d at 1239-40 (explaining that jury could reasonably find that employer discharged employee because of lawful acts she took in furtherance of FCA suit where there was evidence that employee alleged variety of specific false claims act violations to supervisors and the company fired her less than two weeks later).

Defendant Family Smiles was undisputedly Plaintiff's employer, so the Court will deny summary judgment on Counts 13-15 to Defendant Family Smiles. As to Defendants Khurram Hussain; Dental Dreams a.k.a. Dental Experts, LLC, an Illinois limited liability company, and KOS Services, LLC, the Court will consider the arguments pertaining to their liability *infra*.

### (2) ADA (Count 16)

Plaintiff asserts in Count 16 that Defendants violated the ADA by terminating his employment because of his disability and in failing to reasonably accommodate him with respect to his disability. Defendants argue that Khurram Hussain fired Dr. Hernandez-Gil because he refused to stop bringing his dog to the dental clinic, was unwilling to discuss alternative arrangements for housing the dog, and because he had been rude and unprofessional to both staff and patients, resulting in patient complaints. *See* Decl. of Khurram Hussain ¶ 3, ECF No. 112-5.

### (a) Failure to Accommodate

For a failure-to-accommodate claim, the Tenth Circuit has adopted a modified burden-shifting framework in which a disabled plaintiff may make a prima facie case of employment discrimination under the ADA by showing that (1) he is disabled; (2) he is otherwise qualified; and (3) he requested a plausibly reasonable accommodation. *Punt v. Kelly Services*, 862 F.3d 1040, 1050 (10th Cir. 2017). To make a prima facie showing that the accommodation request was reasonable, a plaintiff need only show that the accommodation seems reasonable on its face. *See U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401-02 (2002). "Once the employee produces evidence sufficient to make a facial showing on … her prima facie case, the burden of production shifts to the employer to present evidence either (1) conclusively rebutting one or more elements of plaintiff's prima facie case or (2) establishing an affirmative defense, such as undue hardship or one of the other affirmative defenses available to the employer." *Punt*, 862 F.3d at 1050. *Accord Hwang v. Kansas State University*, 753 F.3d 1159, 1161 (10th Cir. 2014). If the employer satisfies its burden, summary judgment will be appropriate for the employer unless the employee presents evidence establishing a genuine dispute regarding the affirmative defense and/or rehabilitates any challenged element of his prima facie case to create a genuine

dispute of material fact on the elements. *Punt*, 862 F.3d at 1050.

Defendants argue that the accommodation Plaintiff demanded was unreasonable and imposed an undue hardship. They assert that Plaintiff demanded that Boscoe be housed in the clinic's only office, in which he barricaded the door with a gate and got angry when others tried to open the gate, making it difficult for others to use the office. Defendants contend that Boscoe was not a service dog, because he was "in training" and thus the presence of a non-service dog in the office was not a plausibly reasonable accommodation. Plaintiff responds that there is evidence that Boscoe was a service dog in training, and thus, there is a question of fact as to whether Boscoe's presence in the office was a reasonable accommodation for his disability.

The parties have not cited any federally-mandated animal training standards; instead, there do not appear to be any. *See Cordoves v. Miami-Dade County*, 92 F.Supp.3d 1221, 1230 (S.D. Fla. 2015) ("there are no federally-mandated animal training standards") (quoting *Prindable v. Ass'n of Apartment Owners of 2987 Kalakaua*, 304 F.Supp.2d 1245, 1256 (D. Haw. 2003)). In the context of Title III of the ADA, regarding nondiscrimination on the basis of disability by public accommodations, a public accommodation must modify policies, practices, or procedures to permit the use of a service animal by an individual with a disability. 28 C.F.R. § 36.302(c)(1).[11] According to the Department of Justice ("DOJ") definitions, a "service animal" is "any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability." 28 C.F.R. § 36.104. Work or tasks performed by a service animal must be directly related to the person's disability, and may include helping persons with psychiatric

---

[11] Title I of the ADA prohibits discrimination in employment and the EEOC has authority to issue regulations pertaining to Title I; Title III prohibits discrimination by public accommodations and the Attorney General has authority to issue regulations pertaining to Title III. *McDonald v. Department of Environmental Quality*, 214 P.3d 749, 762 n.8 (Mont. 2009) (and cited statutory and regulatory authority).

disabilities by preventing or interrupting impulsive or destructive behaviors. *Id.* The provision of emotional support, well-being comfort, or companionship does not constitute work by a service animal. *Id.*

In another related context, the Fair Housing Act ("FHA") prohibits discrimination against persons with disabilities, including "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford" a disabled person "equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). The Department of Housing and Urban Development ("HUD"), the agency charged with administering the FHA, has provided guidance regarding service animals, using a broader definition of "assistance animal" than the DOJ's "service animal" test. *See Arnal v. Aspen View Condominium Association, Inc.*, 226 F.Supp.3d 1177, 1184 (D. Colo. 2016) (citing HUD Office of Fair Housing & Equal Opportunity, FHEO Notice FHEO–2013–01). HUD defines an assistance animal as any animal that "works, provides assistance, or performs tasks for the benefit of a person with a disability, or provides emotional support that alleviates one or more identified symptoms or effects of a person's disability." HUD Notice FHEO 2013-01, at 2, April 25, 2013, U.S. Department of Housing and Urban Development Archives, found at https://search.usa.gov/search?affiliate=archives.hud.gov&query=FHEO-2013-01. "For purposes of reasonable accommodation requests, neither the FHAct nor Section 504 requires an assistance animal to be individually trained or certified." *Id.* HUD requires a modification of a "no pets" rule where the person has a disability and has a disability-related need for an assistance animal, unless doing so would impose an undue burden. *See id.* at 2-3.

It is unclear whether the EEOC would follow the more stringent "service animal" definition set forth by the DOJ or HUD's interpretation of assistance animal in the "reasonable

accommodation" housing context. Nevertheless, when courts have analyzed the issue of whether a dog is a "service animal" under Title III of the ADA, they have not required the plaintiff on summary judgment to proffer documented evidence of training, or to show that the dog was trained by a "certified trainer," rather than individually trained at home. *Cordoves*, 92 F.Supp.3d at 1230 (and cited cases). There are no specific requirements as to the amount or type of training for a dog to be deemed a "service animal," but the dog should be trained to perform tasks or do work for the benefit of the disabled person, which has been described as a "low bar" and "not a taxing requirement." *Id.* To survive summary judgment, a plaintiff must provide evidence of specific work or tasks the animal was trained to perform for the plaintiff's benefit. *Id.* at 1231. A plaintiff must show that the animal has already been trained to do the task; merely being still in training is not sufficient. *Id.* at 1231. The Court finds this law persuasive in determining whether the use of Boscoe in the office was a plausibly reasonable accommodation. *See McDonald v. Department of Environmental Quality*, 214 P.3d 749, 762 (Mont. 2009) (considering Title III regulations pertaining to service animals as persuasive authority to extent they are not inconsistent with Title I regulations and Montana Human Rights Act).

It is undisputed that Boscoe was "in training" and his training would not be complete for up to a year after May 2013. Although Boscoe did not have documentation to show completed training, that alone does not preclude a jury from finding Boscoe to be a service animal so long as, at the time of the events at issue, he was trained to perform tasks and work for the benefit of Plaintiff in alleviating his General Anxiety Disorder or PTSD. Plaintiff has provided evidence in the form of his own testimony of how Boscoe, at the time of his employment, was capable of detecting Plaintiff's panic attack, cuing Plaintiff if he could see Boscoe, and minimizing or alleviating the panic attacks for Plaintiff, if Plaintiff was in his presence. Plaintiff averred in his

Verified Complaint that Boscoe had "trained responses" to Plaintiff's anxiety and his presence alleviated his symptoms. Verified Am. Compl. ¶ 349, ECF No. 52. Although his training was not complete, the record suggests Boscoe was in the process of being trained, and there is evidence from which a jury could find that Boscoe had sufficient training at the time of Plaintiff's employment to perform tasks or do work for the benefit of Plaintiff's disability. *Cordoves*, 92 F.Supp.3d at 1225, 1231-32 (denying defendant summary judgment on ADA claim, despite that plaintiff was self-training dog to detect and alleviate her panic attacks, because plaintiff provided evidence that dog at time of events could detect onset of panic attacks and respond in a specific way to minimize and alleviate her attacks).

The Court also finds that questions of fact exist for a jury's resolution regarding whether the presence of Boscoe in the office created an undue hardship. There is a dispute of fact concerning the difficulty of access to the office and odors with Boscoe present. The Court is therefore unable to conclude as a matter of law that permitting Boscoe to remain in the office presented a "significant difficulty or expense incurred by a covered entity." *See* 29 C.F.R. § 1630.2 (defining "Undue hardship").

Furthermore, once an employee requests a reasonable accommodation, the ADA requires an employer, in determining the appropriate reasonable accommodation, "to initiate an informal, interactive process with the individual with a disability in need of the accommodation" in order to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). The interactive process is mandatory and requires both parties to engage in good faith. *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1172 (10th Cir. 1999); *Kleiber v. Honda of America Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007). When a party refuses to participate in good faith, "courts

should attempt to isolate the cause of the breakdown and then assign responsibility." *Kleiber*, 485 F.3d at 871 (internal quotation omitted). "[N]either party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability." *Smith*, 180 F.3d at 1172 (quoting *Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 634 (7th Cir. 1998)). "Liability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown." *Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1137 (7th Cir. 1996). When the employer does not obstruct the process, but makes reasonable efforts to communicate with the employee and provide accommodations, the employer will not be liable under the ADA. *Id.*

Under Plaintiff's version of events, the interactive process began with his discussions with Ms. Pinto and he says he was open to considering other containment options for Boscoe, so long as he could see him. Although Defendants have evidence that the process broke down due to Plaintiff's behavior, Plaintiff's sworn testimony contradicts that evidence. According to Plaintiff, Mr. Hussain refused to consider any documentation Plaintiff had concerning his need for Boscoe and Boscoe's training.[12] Instead, Mr. Hussain instructed Plaintiff that he must leave the dog at home, and if he brought him to work the next day, he would be fired. Viewing the evidence in Plaintiff's favor, a jury could find that Mr. Hussain already closed off the possibility of allowing any service dog, however well-trained, in the office, refused to discuss how a service dog could assist Plaintiff, refused to consider any paperwork Plaintiff claimed to have regarding Boscoe's training, and did not consider or propose alternative accommodations. Consequently, the Court will leave to the jury to determine whether Plaintiff's employer engaged in the

---

[12] Defendants assert that Plaintiff could not have provided Family Smiles with documents concerning Boscoe's purported credentials to Family Smiles. That fact may be relevant at trial as to whether Boscoe was sufficiently trained to act as a service dog to help Plaintiff cope with his disability, but for purposes of determining whether Family Smiles engaged in good faith in the interactive process, the alleged refusal to consider purported paperwork is relevant as well.

interactive process in good faith and whether the breakdown in the interactive process was caused by Mr. Hussain's obstruction and refusal to communicate and propose further accommodations, or was caused by Plaintiff's refusal to communicate and discuss other reasonable accommodations. *See Smith*, 180 F.3d at 1172 (noting that a party that fails to communicate, by way of initiation or response, may be acting in bad faith); 29 C.F.R. Pt. 1630, App. § 1630.9 (setting forth employer's requirements after a request for reasonable accommodation has been made, including consulting with individual to be accommodated, identifying potential accommodations, assessing effectiveness each would have in enabling the individual to perform the essential functions of the position, and considering preference of the individual and select and implement the accommodation that is most appropriate for both the employee and the employer).[13]

### (b) Termination because of disability

To establish a prima facie case of discrimination under the ADA, a plaintiff may demonstrate that (1) he is disabled; (2) he is qualified, with or without reasonable accommodation, to perform the essential functions of the job he holds; and (3) his employer discriminated against him because of his disability. *Equal Employment Opportunity Commission v. BNSF Railway Company*, 853 F.3d 1150, 1155 (10th Cir. 2017). Defendants contest the third prong, arguing that Plaintiff has not shown that his employer fired him because of his PTSD and General Anxiety Disorder. Plaintiff argues, however, that the inference of unlawful disability discrimination may be made because Mr. Hussain forbade him from bringing his service dog to

---

[13] Defendants have submitted evidence from their expert William Goren, Esq., in which he opines that Plaintiff was responsible for the breakdown in the interactive process and that housing Boscoe in the dental office imposed an undue hardship on Family Smiles. *See* Report of William Goren, ECF No. 113-1. Plaintiff has moved to exclude Mr. Goren's opinions. The Court will consider the motion to exclude in a separate opinion. Even assuming that the Court would permit Mr. Goren's testimony, the Court finds that contrary expert testimony is not required to create a question of fact. The facts construed with all inferences in Plaintiff's favor create questions of fact that a jury may resolve in deciding the ultimate questions of law.

work, and Plaintiff insisted upon it. For the reasons discussed *supra*, the timing of his firing very shortly on the heels of the disclosure of his disability is evidence from which a jury could infer the reason for his firing was really because of his disability. Moreover, for the reasons discussed in the next section, Plaintiff has sufficient evidence suggesting the proffered reasons were pretextual to submit the factual questions to the jury.

For the foregoing reasons, the Court will deny Family Smiles summary judgment on Count 16. Plaintiff limited Count 16 to Family Smiles, Khurram Hussain, and KOS Services, Inc. Pl.'s Resp. 18 n.2, ECF No. 123. The Court will therefore dismiss Count 16 against Dental Dreams, LLC a.k.a. Dental Experts, LLC; Sameera Hussain; Dental Dreams, LLC, a New Mexico limited liability company; and Frank Von Westernhagen. As for Mr. Hussain and KOS Services, the Court will discuss their liability later in this opinion.

### (3) Title VII and NMHRA sex discrimination (Counts 17 and 18)

Title VII prohibits discrimination by an employer against an individual because of sex in the terms and conditions of employment. *See* 42 U.S.C. § 2000e-2. The NMHRA follows the same standard for establishing wrongful discrimination as Title VII. *Lobato v. New Mexico Environment Dept.*, 733 F.3d 1283, 1296 (10th Cir. 2013).

Defendants first argue that the record evidence does not create a material fact regarding whether Plaintiff's termination had anything to do with his sexual orientation, because the claim is at odds with Plaintiff's sworn statement to the NMHRB in which he identified his refusal to stop bringing Boscoe to work as the reason for his termination. The Court does not believe that Plaintiff's Title VII sex discrimination claim is necessarily at odds with the Charge of Discrimination. Defendants refer to Plaintiff's statement that "Respondent's reason for Adverse Action" was Plaintiff's "refusal to stop bringing a Service Dog to work." That statement could be

construed as Plaintiff relating what Mr. Hussain gave verbally as the reason for firing Plaintiff. Plaintiff gave other specific facts in the Charge of Discrimination indicating the reasons he believed the actual basis for his termination was multi-fold -- because of his disability, sexual orientation, and in retaliation for asserting rights under the ADA, Title VII, and NMHRA. The Court will therefore turn to the *McDonnell Douglas* analysis.

A plaintiff may establish a prima facie case of wrongful termination by a preponderance of the evidence by showing that (1) he belongs to a protected class; (2) he was qualified for the job; (3) despite his qualifications, he was fired; and (4) the job was not eliminated after his termination. *DePaula*, 859 F.3d at 969.[14] In his response, Plaintiff argues that he has presented sufficient evidence to show he was a member of a protected class based on his sexual orientation (homosexual male), he was qualified for the job, and was terminated. Plaintiff argues that the issue in dispute in Counts 17 and 18 is whether he was fired under circumstances giving rise to an inference of unlawful discrimination. Defendants assert that, even if Plaintiff could demonstrate a prima facie case of discrimination based on sexual orientation, they had legitimate, non-discriminatory reasons for terminating him because of his refusal to discuss alternate arrangements for his dog and his rude and unprofessional behavior to staff and patients. Defendants have met their exceedingly light burden of production.

Plaintiff, however, has provided evidence indicating that these reasons were false. Family Smiles had a policy permitting service dogs in the office, and Plaintiff has submitted evidence, construed in his favor, which indicates that Mr. Hussain refused to consider Plaintiff's documentation indicating that Boscoe was a service dog and did not attempt to engage in a

---

[14] Although Plaintiff mentions in his complaint a "hostile work environment," *see* Verified Am. Compl. ¶ 384, he does not appear to be pursuing a hostile work environment theory of discrimination based on his response and the Pretrial Order (ECF No. 135). The Court will therefore limit its own inquiry as to Counts 17 and 18 to the theory on which the parties have based their arguments – whether Plaintiff was terminated because of his sexual orientation.

discussion of reasonable accommodation for his dog; instead, he fired him for his desire to bring Boscoe into work the next day, despite a policy permitting it. A plaintiff may "show pretext by demonstrating 'the defendant acted contrary to a written company policy,' an unwritten company policy, or a company practice 'when making the adverse employment decision affecting the plaintiff.'" *DePaula*, 859 F.3d at 970 (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)). As for the patient and staff complaints, Plaintiff argues that the record evidence of patient and staff complaints was made after he was fired, supporting an inference that Defendants retroactively created a purportedly legitimate reason to fire him after in fact firing him for discriminatory reasons. Viewing the record as a whole, the Court finds that Plaintiff has submitted evidence from which a jury could determine that his employer did not honestly believe the reasons given for Plaintiff's termination and did not act in good faith upon those beliefs, precluding summary judgment. *Jones v. Oklahoma City Public Schools*, 617 F.3d 1273, 1280 (10th Cir. 2010) ("Consequently, once a plaintiff presents evidence sufficient to create a genuine factual dispute regarding the veracity of a defendant's nondiscriminatory reason, we presume the jury could infer that the employer acted for a discriminatory reason and must deny summary judgment.") (internal quotation omitted). The Court notes that Plaintiff's evidence for discrimination based on sex is thin, but the Court may not weigh the evidence. At this stage, because Plaintiff has produced evidenced that he was fired very closely in time after disclosing his sexual identity and complaining about Mr. Sandoval's unwanted advances, and he has produced evidence of pretext, the Court will send the factual questions to a jury and deny summary judgment to Family Smiles.

Plaintiff limited Counts 17-18 to Family Smiles, Khurram Hussain, and KOS Services. Pl.'s Resp. 18 n.2, ECF No. 123. The Court will therefore dismiss Counts 17-18 against Dental

Dreams, LLC a.k.a. Dental Experts, LLC; Sameera Hussain; Dental Dreams, LLC, a New Mexico limited liability company; and Frank Von Westernhagen. The Court will address the liability of Mr. Hussain and KOS *infra*.

### (4) Retaliation under ADA, Title VII, & NMHRA (Counts 19-21)

To state a prima facie case of retaliation under Title VII or the ADA, the plaintiff must show (1) that he engaged in protected opposition to discrimination; (2) he suffered an adverse action that a reasonable employee would have found materially adverse; and (3) a causal connection existed between the protected activity and the materially adverse action. *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1219 (10th Cir. 2013) (Title VII); *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999) (ADA). Defendants argue that summary judgment is appropriate because Plaintiff does not have evidence that he was terminated because of purported objections to discrimination based on his sexual orientation or because he opposed acts prohibited by the ADA. Again, to satisfy the third element, a plaintiff must demonstrate that the person who took the adverse action against her knew of the employee's protected activity, or that the person allegedly harboring the discriminatory animus knew and used the person who effected the adverse action as the "cat's paw" to affect his own discriminatory designs. *Montes*, 497 F.3d at 1176. Temporal proximity between protected activity and the adverse action may permit an inference of causation. *Hysten*, 296 F.3d at 1183-84.

Evidence construed in Plaintiff's favor shows that he was fired in very close proximity to requesting a reasonable accommodation for his disability from Ms. Pinto and Mr. Hussain and for complaining about Mr. Sandoval's unwanted sexual advances to Ms. Pinto. For similar reasons that the Court is sending to the jury the FCA, MFCA, and FATA retaliation claims and the underlying discrimination claims, the Court finds that Plaintiff has satisfied his burden of

production under *McDonnell Douglas*. The Court will therefore deny summary judgment to Family Smiles on Counts 19-21.

Once again, Plaintiff limited Counts 19-21 to Family Smiles, Khurram Hussain, Dental Dreams a.k.a. Dental Experts, LLC, and KOS Services. Pl.'s Resp. 18 n.2, ECF No. 123. The Court will therefore dismiss Counts 19-21 against Sameera Hussain; Dental Dreams, LLC, a New Mexico limited liability company; and Frank Von Westernhagen. The Court will address the liability of the remaining non-Family Smiles Defendants below.

### c. Wrongful Denial and Delay of Final Wages (Count 25)

Defendants did not move for summary judgment on Plaintiff's state law wage claim against Family Smiles, but did move to dismiss all other Defendants named in Count 25. In his response, Plaintiff agreed to limit Count 25 to Family Smiles. *See* Pl.'s Resp. 18 n.2, ECF No. 123. The Court will therefore grant summary judgment to all Defendants other than Family Smiles as to Count 25.

### d. Punitive Damages

Defendants assert that there is no evidence from which Plaintiff can show he satisfied the standard for imposing punitive damages – acting with "malice or with reckless indifference to the federally protected rights of an aggrieved individual," *see* 42 U.S.C. § 1981a(b)(1). Plaintiff failed to respond to this argument concerning whether there was evidence sufficient to sustain an award of punitive damages. Nevertheless, in light of all the questions of fact identified *infra*, the Court finds the question of whether Defendants acted with malice or indifference to Plaintiff's rights is a matter for the jury to determine and will deny summary judgment at this time.

### e. Liability Against Named Defendants

Defendants argue that there is no basis to assert Plaintiff's discrimination and retaliation

claims against any Defendants other than Family Smiles. *See* Defs.' Mot. for Summ. J. 39-40, ECF No. 112. Defendants contend the "record is devoid" of evidence to support veil-piercing, arguing that Plaintiff failed to show evidence to satisfy each of the three elements for veil-piercing. *Id.* at 40. These arguments mirror those made and developed more fully in Defendants' motion to partially dismiss the amended complaint (ECF No. 57), which Defendants reference in their motion for summary judgment.

Plaintiff states in his summary judgment response that he continues to assert liability against Family Smiles, Khurram Hussain, Dental Dreams a.k.a. Dental Experts, LLC, and KOS Services, LLC, for his various retaliation claims and against Family Smiles, Khurram Hussain, and KOS Services for his ADA and Title VII discrimination claims. *See* Pl.s Resp. 18 n.2, ECF No. 123. Plaintiff, however, failed to address in his response to the summary judgment motion the arguments Defendants made that the record is devoid of evidence to support veil-piercing. Plaintiff did not cite to specific evidence in the summary judgment record to support his theories of liability for entities other than Family Smiles. Nor did Plaintiff expressly incorporate arguments he made in his response to Defendants' motion to dismiss.

Plaintiff nevertheless sets forth in his response to Defendants' motion to dismiss the theories of liability upon which he relies. As discussed *infra*, the Court finds that the claims against Dental Dreams, LLC a.k.a. Dental Experts, LLC, an Illinois limited liability company, and KOS Services, LLC, will survive Rule 12(b)(6) dismissal, but the claims against Defendant Khurram Hussain will be dismissed under Rule 12(b)(6). The Court thus needs to determine whether claims against Dental Dreams, LLC a.k.a. Dental Experts, LLC, an Illinois limited liability company, and KOS Services, LLC, survive summary judgment or whether Plaintiff waived them.

In the response to the motion to dismiss, Plaintiff relies on numerous paragraphs of his Verified Amended Complaint that were sworn to by Dr. Hernandez-Gil, *see* Verification, ECF No. 52 at 124 of 125. Consequently, the record contains arguments on the issue of veil-piercing using potentially admissible evidence on summary judgment (that to which Plaintiff has personal knowledge). Nevertheless, since the filing of the briefing on the motion to dismiss, discovery has proceeded, and Defendants re-briefed the issues on summary judgment. Issues of fairness to Defendants are at play as to whether the Court should consider arguments and evidence in separate briefing that were not incorporated into the summary judgment briefing. Generally, when Defendants raise an argument of lack of evidence on summary judgment, it is Plaintiff's burden on summary judgment to set forth the admissible evidence it wishes the Court to consider.

The Court would like to hear arguments from the parties regarding whether Plaintiff has waived his claims of liability so that summary judgment should be granted to Dental Dreams a.k.a. Dental Experts, LLC, an Illinois limited liability company, and KOS Services, LLC, on the remaining claims against them. *See* Fed. R. Civ. P. 56(e) (providing options for court when party fails to properly address another party's assertion of fact, including opportunity to support or address fact). The Court will consider arguments on this limited issue of waiver at the Call of the Calendar hearing already currently scheduled for Thursday, April 5, 2018, at 1:30 p.m. Given that this Memorandum Opinion and Order resolves most of the issues of the pending motions, the Court will grant the Joint Motion for Hearing and for Oral Argument on pending Motions (ECF No. 136) only in part to permit argument at the Call of the Calendar on the outstanding issues remaining for trial and not resolved by the entry of this order.

## B.  Defendants' Motion to Partially Dismiss Amended Complaint and to Strike

In Defendants' Motion to Partially Dismiss Amended Complaint and to Strike (ECF No. 57), they seek to strike certain allegations in the Amended Complaint inconsistent with the Court's prior Memorandum Opinion and Order and to dismiss defendants other than Family Smiles, LLC ("Family Smiles"), the entity that employed Plaintiff directly. Many of the issues highlighted in the motion to dismiss, however, are now moot.

First, Defendants moved to dismiss FCA, MFCA, and FATA claims to the extent they state claims involving patients treated by dentists other than Drs. Shafer and Agarwal. Plaintiff's claims have been limited to patients of Dr. Shafer, so this argument is now moot. Defendants also seek to dismiss the qui tam claims under the FCA, MFCA, and FATA against non-Family Smiles Defendants. Plaintiff agreed to the dismissal of those claims "against any of the Defendants other than Family Smiles" in footnote 7 of his response, so that argument is now moot. *See* Pl.'s Resp. 23 n.7, ECF No. 123. Defendants moved to dismiss claims against non-Family Smiles entities in Counts 22-23 and Count 25. Plaintiff dismissed Counts 22-23 and agreed to limit Count 25 to Family Smiles, so these arguments are moot.

Defendants additionally moved to strike allegations of the amended complaint concerning extra-contractual promises. Plaintiff is no longer proceeding on claims related to those provisions, so the Court will strike the provisions upon which Plaintiff is no longer relying.

Finally, Defendants seek to dismiss the retaliation and discrimination claims against all Defendants other than Family Smiles. Plaintiff in his response "acknowledges that only the employer itself may be directly liable for the retaliation and discrimination claims under the FCA, MFCA, FATA, ADA and Title VII." Pl.'s Resp. 10, ECF No. 64.[15] Indeed, direct liability does not extend to non-employer individuals under those statutes. *See Howell v. Town of Ball*,

---

[15] Plaintiff does not address whether New Mexico allows for direct liability for non-employer individuals under the NMHRA (relevant to Counts 18 and 21). Plaintiff, however, only urges liability under alter ego and integrated enterprise theories. The Court therefore deems any argument about direct liability under the NMHRA waived.

827 F.3d, 529-30 (5th Cir. 2016); *Stailey v. Gila Regional Medical Center*, Civ. No. 16-0485 JCH/GJF, 2017 WL 3602057, *3-4 (D.N.M. Feb. 21, 2017). Plaintiff, however, argues his retaliation and discrimination claims against the individual and other corporate Defendants should proceed under alter ego and/or integrated enterprise theories. Since the filing of the motion to dismiss, Plaintiff has limited the retaliation and discrimination claims to Family Smiles, Khurram Hussain, Dental Dreams a.k.a. Dental Experts, LLC, and KOS Services, LLC, so the Court need only address these veil-piercing theories as to Khurram Hussain, Dental Dreams a.k.a. Dental Experts, LLC, and KOS Services, LLC.

### 1. Alter Ego Theory

The Tenth Circuit has applied the following two-part test for the federal common law doctrine of piercing the corporate veil under an alter ego theory:

> (i) was there such unity of interest and lack of respect given to the separate identity of the corporation by its shareholders that the personalities and assets of the corporation and the individual are indistinct, and (ii) would adherence to the corporate fiction sanction a fraud, promote injustice, or lead to an evasion of legal obligations.

*N.L.R.B. v. Greater Kansas City Roofing*, 2 F.3d 1047, 1052 (10th Cir. 1993). Under the second prong, a court should only invoke its equitable power when there is adequate justification, requiring "an element of unfairness, injustice, fraud, or other inequitable conduct as a prerequisite to piercing the corporate veil." *Id.* Piercing the corporate veil should be done "reluctantly and cautiously," *id.* at 1051, and only "when the corporate structure has been misused to perpetrate fraud, evade existing obligations, or to circumvent a statute," *id.* at 1052 (internal quotations omitted).

Similarly, under New Mexico law, a plaintiff must satisfy three requirements to be entitled to pierce the corporate veil: (1) a showing of instrumentality or domination, (2) improper

purpose, and (3) proximate causation. *Scott v. AZL Resources, Inc.*, 1988-NMSC-028, ¶ 7, 753 P.2d 897. The first requirement is the alter ego doctrine theory and requires showing that the subsidiary was operated "not in a legitimate fashion to serve the valid goals and purposes of that corporation but functioned under the domination and control and for the purposes of some dominant party." *Id.* A plaintiff must show that "recognition of the separate corporate existence of the two corporations would sanction fraud or other improper purposes." *Id.*

Even assuming the allegations are sufficient to satisfy the first prong of each test, the amended complaint does not allege sufficient facts to show that Khurram Hussain, Dental Dreams a.k.a. Dental Experts, LLC, or KOS Services, LLC, abused the corporate form to perpetrate a fraud, promote injustice, to evade legal obligations, or for another improper purpose that would justify disregarding the "corporate" form. There are not sufficient non-conclusory facts to suggest inadequate capitalization of Family Smiles. Moreover, the allegations that Mr. Hussain had an ownership interest in Family Smiles and KOS Services, which was a separate entity that provided administrative services for Family Smiles, or that Dental Experts exercised considerable control over Family Smiles' operations are not sufficient to indicate that the corporate structure was set up for fraudulent purposes. The Court therefore concludes that Plaintiff has not met his burden of alleging sufficient non-conclusory facts to plausibly show that Khurram Hussain, Dental Dreams a.k.a. Dental Experts, LLC, or KOS Services, LLC, may be held liable under an alter ego theory of liability under either federal or state law. *Cf. Greater Kansas City Roofing*, 2 F.3d at 1049, 1055 (holding it was error to hold sole shareholder personally liable for judgment against corporation she controlled because that there was no evidence to suggest her disregard for many corporate formalities constituted fraud or was done to cause the company to be less able to pay a judgment); *Scott*, 1988-NMSC-028, ¶¶ 10-12 (holding

that there was insufficient evidence of improper purpose to pierce corporate veil, even though corporations shared common directors and officers, one company was sole shareholder of three corporations and exercised total control over bank balances of each, because there was no showing that three corporations were undercapitalized when incorporated, that their financial setup was only a sham, or any injustice resulted from setup).[16]

### 2. Integrated Enterprise Theory

"The law allows businesses to incorporate to limit liability and isolate liabilities among separate entities," resulting in "a strong presumption that a parent company is not the employer of its subsidiary's employees." *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1362 (10th Cir. 1993). When a plaintiff asserts, however, that he is an employee of more than one entity under Title VII and the ADA, a plaintiff may establish liability under the joint-employer and single-employer tests. *See Bristol v. Board of County Com'rs of County of Clear Creek*, 312 F.3d 1213, 1218 (10th Cir. 2002). "This joint-employer test acknowledges that the two entities are separate, but looks to whether they co-determine the essential terms and conditions of employment." *Id.* "Second, a plaintiff who is the employee of one entity may seek to hold another entity liable by arguing that the two entities effectively constitute a single employer." *Id.* "Although these two tests are sometimes confused, they differ in that the single-employer test asks whether two nominally separate entities should in fact be treated as an integrated enterprise, while the joint-employer test assumes that the alleged employers are separate entities." *Id.*

One "recognized" method for determining the alternative single-employer test is the

---

[16] Even if the allegations of the complaint were sufficient under Rule 12(b)(6), and if Plaintiff did not waive the argument on summary judgment, the Court notes that the factual assertions for which Plaintiff has personal knowledge, and about which he is competent to testify, are far fewer than the totality of the allegations. From the summary judgment record, a reasonable jury would not be able to find that Khurram Hussain, Dental Dreams a.k.a. Dental Experts, LLC, or KOS Services, LLC, abused the corporate form to perpetrate a fraud, promote injustice, to evade legal obligations, or for another improper purpose that would justify disregarding the "corporate" form under an alter ego theory.

integrated-enterprise test. *See Romano v. U-Haul Intern.*, 233 F.3d 655, 665 (1st Cir. 2000) (noting that none of tests were explicitly adopted by First Circuit but that "integrated-enterprise test currently appears to be the standard adopted, or at least applied, by a majority of circuits that have reached the issue") (and cited cases). *See also Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir. 1983) (adopting four-part used by Supreme Court for labor disputes). The Tenth Circuit has applied the test without explicitly adopting it in Title VII claims. *Knowlton v. Teltrust Phones, Inc.*, 189 F.3d 1177, 1184 (10th Cir. 1999) (applying integrated-enterprise test because parties assumed its application); *Frank*, 3 F.3d at 1362 (same); *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1069-70 (10th Cir. 1998) (stating that "trend in Title VII cases appears to be in favor of adopting [single employer/integrated enterprise] test" but noting Tenth Circuit has yet to adopt it). Nor does it appear that New Mexico courts have adopted (or rejected) the test. *See Sonntag v. Shaw*, 2001-NMSC-015, ¶ 24, 22 P.3d 1188 (discussing federal single entity test and stating that barring express adoption of tests, "these federal tests do not control our interpretation of a New Mexico state statute").

Defendants dispute the application of the integrated enterprise test, arguing that it should be limited to the National Relations Labor Board context from whence it came. *See Papa v. Katy Industries, Inc.*, 166 F.3d 937, 940-43 (7th Cir. 1999) (explaining that single employer test came from test used by National Labor Relations Board to resolve issues of affiliate liability, and declining to use that test under anti-discrimination statute). Defendants, however, offer no alternative test that the Tenth Circuit would likely apply. Circuits are split on which test should be used for the joint employment doctrine under anti-discrimination laws. *See Butler v. Drive Automotive Industries of America, Inc.*, 793 F.3d 404, 410-14 (4th Cir. 2015) (discussing tests applied by sister circuits and ultimately adopting hybrid test). Although not explicitly adopted in

*Bristol*, the Court will nevertheless apply the joint employer and single-employer tests as described in *Bristol*, which was decided after the *Papa* case and in which the Tenth Circuit gave no indication that it was likely to reject the tests' use in the anti-discrimination context.

Under the joint-employer test, independent entities are joint employers if they "share or co-determine those matters governing the essential terms and conditions of employment." *Bristol*, 312 F.3d at 1218 (quoting *Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350, 1360 (11th Cir. 1994)). A court looks to whether "both entities exercise significant control over the same employees." *Id.* (internal quotations omitted). "Courts applying the single-employer test generally weigh four factors: (1) interrelations of operation; (2) common management; (3) centralized control of labor relations, and (4) common ownership or financial control." *Id.* at 1220 (internal quotations omitted). The third factor is the most important. *Id.* The question is which entity made the final decisions regarding employment matters related to the person claiming discrimination. *Frank*, 3 F.3d at 1363. Broad policy statements issued by the parent company is not enough; the parent company must control day-to-day employment decisions of the subsidiary. *Id.*

As an initial matter, Plaintiff has not shown that the joint employer or single employer test would apply to a person, rather than an entity. The Court will therefore dismiss Khurram Hussain from the case as a matter of law. However, as to Dental Dreams a.k.a. Dental Experts and KOS Services, the allegations state a claim to survive Rule 12(b)(6) or Rule 12(c) dismissal. The allegations indicate that Dental Dreams a.k.a. Dental Experts and KOS had a high degree of interrelatedness in the day-to-day operations for administrative purposes dealing with employees of Family Smiles. *See*, *e.g.*, Verified Am. Compl. ¶ 107 (alleging Plaintiff received email from Abby Heckler containing attachments with a "new hire" packet of materials, the attachment of

which was entitled "DentalDreamsNewEmployee.doc," email listed her as agent of KOS and Dental Experts, email contained Form I-9, Employment Eligibility Verification, which was partially filled out identifying "Juliette Boyce" from "HR" from "KOS Services LLC" in the employer block); ¶ 108, ECF No. 52 (alleging dentist called Plaintiff on behalf of "Dental Dreams" and spoke to him about the company's general practice); ¶ 174 (Plaintiff exchanged emails with Mubeena Nurani about his work schedule, and her signature block indicated she represented KOS and Dental Experts); ¶ 177 (Plaintiff exchanged email concerning his complaint about amount of his paycheck with Christine Benesa at KOS), ECF No. 52.

Significantly, the Employment Agreement between Plaintiff states it is between him and "Family Smiles" as well as "its parent" and "affiliate." Employment Agreement 1, ECF No. 52-1. The agreement itself thereafter sets forth the duties of "FSL," which is expressly the collective term for Family Smiles, its parent, its affiliate, etc. *Id.* The allegations indicate that both Dental Dreams a.k.a. Dental Experts, LLC, and KOS Services, Inc., had centralized control of labor relations, common management, and common ownership. The allegations also suggest that those entities shared or co-determined matters governing the essential terms and conditions of Plaintiff's employment. The Court will therefore not dismiss at this time the claims against those two entities.

However, as discussed above, the Court is not convinced that Plaintiff has satisfied his burden on summary judgment to keep Dental Dreams a.k.a. Dental Experts, LLC, and KOS Services, LLC, in the case. The Court will take up argument on this waiver issue at the Call of the Calendar on April 5, 2018.

### C. Defendants' Motion to Exclude Certain Opinions and Testimony of Plaintiff's Expert Witness, Dr. Ryan Moffat

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods, and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (2011). *See also 103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006) (describing analysis as two-steps: (1) determining whether expert is qualified and (2) whether the expert's opinion is reliable under *Daubert* principles[17]). The touchstone of admissibility under Rule 702 is helpfulness to the trier of fact. *Werth v. Makita Elec. Works, Ltd.*, 950 F.2d 643, 648 (10th Cir. 1991).

A court should consider the following non-exhaustive and non-dispositive factors in determining whether particular expert scientific testimony is reliable: whether the expert's technique or theory can and has been tested; the theory has been subject to peer review and publication; the known or potential rate of error of the technique or theory when applied; the existence and maintenance of standards and controls; and the general acceptance of the methodology in the relevant scientific community. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149-50 (1999); *103 Investors*, 470 F.3d at 990 (citing *Daubert*, 509 U.S. at 593-94). The *Daubert* Court clarified that the focus must be solely on the principles and methodology, not on the conclusions they generate. *Daubert*, 509 U.S. at 595. With other non-scientific experts, "the relevant reliability concerns may focus upon personal knowledge or experience." *Kumho*, 526 U.S. at 150 (emphasis added).

---

[17] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Expert witnesses may testify about ultimate issues of fact, but an expert may not state legal conclusions drawn by applying the law to the facts. *United States v. Richter*, 796 F.3d 1173, 1195 (10th Cir. 2015). Although an expert may not give an impermissible legal conclusion, an expert may give testimony that embraces an ultimate issue so long as the expert's testimony assists, rather than supplants, the jury's judgment. *Id.* (quoting *United States v. Dazey*, 403 F.3d 1147, 1171-72 (10th Cir. 2005)); *United States v. Schneider*, 704 F.3d 1287, 1293-94 (10th Cir. 2013) (stating that Rule 704(a) allows expert opinion on an ultimate issue so long as he explains basis for any summary opinion and does not simply tell the jury what result to reach). "Permissible testimony provides the jury with the tools to evaluate an expert's ultimate conclusion and focuses on questions of fact that are amenable to the scientific, technical, or other specialized knowledge within the expert's field." *Richter*, 796 F.3d at 1195.

Defendants argue that Dr. Moffat's opinions that Dr. Shafer engaged in "false or fraudulent" dental work are improper subjects of expert testimony. Dr. Moffat's review of Dr. Shafer's patient records revealed to him a consistent pattern of incorrect billings, which he believed to be inconsistent with what is traditionally accepted in dentistry, and therefore, he concluded the pattern shows an intent taking place to bill incorrectly. *See* Dep. of Dr. Moffat 41:16-25, ECF No. 111-2. Dr. Moffat testified, "I think that if you look at the evidence you'll see many more instances than could be considered simple mistakes." *Id.* 46:15-17. Although he acknowledged that there is no standard in dentistry quantifying how many mistakes may be made before considering a pattern of mistakes in billing to be fraudulent, Dr. Moffat opined that the number of errors represents a pattern that is false or fraudulent based on his judgment that the number of errors was too high. *See id.* 46:25-49:15; 167:25-169:2. Dr. Moffat never spoke with Dr. Shafer, any person who worked with Dr. Shafer, or any patient treated by him. *Id.* 40:16-18,

42:10-12, 43:3-5, ECF No. 111-2. He also acknowledged that simply because standards of care were violated does not mean that the care is false. *Id.* 45:13-19.

Defendants contend that expert testimony on a person's state of mind is not admissible because it invades the role of the jury, renders conclusions on issues of law, and has no basis in any body of expertise. The Court agrees to a limited extent. Dr. Moffat may not testify that Dr. Shafer had fraudulent intent, because that issue is more properly a question for the jury and outside an expert's expertise. See *DePaepe v. General Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998) (concluding that district court erred in allowing expert to testify that company reduced amount of padding in sun visors to save money because he lacked a scientific basis for that opinion). Indeed, Plaintiff agrees that Dr. Moffat should be subject to the limited restriction of not claiming to know what Dr. Shafer's mind was, but he contends that because Dr. Moffat has reviewed in-depth billing records of Dr. Shafer, he should be permitted "to express the conclusions he has drawn concerning Dr. Shafer's intent to defraud." Pl.'s Resp. 4, ECF No. 122.

An expert may testify that certain evidence is consistent with fraud and not innocent conduct or mistakes, so long as the expert provides adequate explanations for his conclusions. *Cf. Richter*, 796 F.3d at 1196 ("Witnesses are permitted to testify about how the law applies to a certain set of facts, so long as they provide adequate explanations for their conclusions."); *Schneider*, 704 F.3d at 1294 (explaining that "the rules do not prevent an expert from drawing conclusions about intent, so long as the expert does not profess to know a defendant's intent," and finding no error in expert testimony that evidence indicated an intention to deceive and defraud the system where expert expressly disclaimed knowledge of the criminal defendant's intent); *DePaepe*, 141 F.3d at 720 (explaining that expert "could give an opinion as an engineer that reducing the padding saved a particular amount of money; he might testify as an engineer

that GM's explanation for the decision was not sound (from which the jury might infer that money was the real reason); but he could not testify *as an expert* that GM had a particular motive"). The Court will therefore turn to the questions of whether Dr. Moffat is qualified to render the opinion and whether he has a reliable methodology or standard supporting his specific opinion concerning the evidence indicating fraud based on the number of billing errors submitted.

Defendant asserts that Dr. Moffat is not qualified to render opinions on Dr. Shafer's fraudulent intent and motives. Defendants assign significance to the fact that Dr. Moffat has not received any training in identifying fraud in dentistry or other areas. The Court is not convinced that specific training in fraud is required. Dr. Moffat has years of training and experience practicing dentistry. He has been a Board Certified Pediatric Dentist since 2006 and has practiced dentistry in private practice since 2001. *See* Report of Dr. Moffat, ECF No. 111-1. He also has experience providing dental services paid by Medicaid. *Id.* at 2.

Nevertheless, the Court finds that Plaintiff has not met his burden of production of showing that Dr. Moffat used a reliable methodology in concluding that Dr. Shafer's billing practices indicated he intended to defraud Medicaid. Dr. Moffat admitted there is no specific standard in dentistry to assign a percentage or number to arrive at a definitive determination of fraud, and so he instead used his "professional opinion" as a dentist that the number of mistakes over the course of a year was too high to indicate innocent mistakes. *See* Dep. of Dr. Moffat 46:2-49:15, 167:12-169:2, ECF No. 111-2. Although the application of experience to the facts can serve as the methodology of an expert, the problem here is that Plaintiff has not cited to anything in the record before the Court showing that Dr. Moffat has reviewed other dentists' records in his training and experience to have a baseline for an opinion that the number of errors

here far exceeds those made in other dental practices. Plaintiff has not even argued what specific methodology Dr. Moffat employed when reaching his fraud conclusion. At this point, Plaintiff has not met his burden under *Daubert* and *Kumho Tire* to show a reliable methodology, so the Court will exclude Dr. Moffat's testimony that the number of errors is so high as to indicate fraud. The jury will have to consider the significance of the numbers without the specific aid of expert testimony on the issue of intent.

**IT IS THEREFORE ORDERED** that

1. Defendants' Motion to Partially Dismiss Amended Complaint and to Strike (**ECF No. 57**) is **GRANTED in part and DENIED in part** as follows:

   a. Defendants' request to **DISMISS** Defendant Khurram Hussain from the case is **GRANTED**;

   b. Defendants' request to dismiss Counts 13-15 and 19-21 against Defendant Dental Dreams a.k.a. Dental Experts, LLC, under Rule 12(b)(6) is **DENIED**.

   c. Defendants' request to dismiss Counts 13-21 against Defendant KOS Services under Rule 12(b)(6) is **DENIED**.

   d. The Court will **STRIKE** allegations concerning extra-contractual promises.

   e. Defendants' remaining requests in the motion to dismiss are **DENIED AS MOOT**.

2. Defendants' Motion for Summary Judgment and Memorandum in Support (**ECF No. 112**) is **GRANTED** in part and **DENIED** in part as follows:

   a. Defendants' request to dismiss Counts 1-12 against Defendant Family Smiles is **DENIED**, but Defendants' motion for summary judgment on Counts 1-12

against all other Defendants is **GRANTED**.

   b. Defendants' request for summary judgment on Counts 13-21 is **DENIED** as to Defendant Family Smiles and is **DENIED AS MOOT** as to Defendant Khurram Hussain who is dismissed under Rule 12(b)(6). The Court **RESERVES RULING** on Defendants' request for summary judgment on Counts 13-15 and 19-21 as to Defendant Dental Dreams a.k.a. Dental Experts, LLC, and on Counts 13-21 as to Defendant KOS Services.

   c. Defendants' request to **DISMISS** counts 22, 23, 24, 26, and 27 is **GRANTED**.

   d. Defendants' request for summary judgment on Count 25 as to Defendants Dental Dreams a.k.a. Dental Experts, LLC, Sammera Hussain, Dental Dreams, LLC, a New Mexico limited liability company, Frank Von Westernhagen, KOS Services, and Khurram Hussain is **GRANTED**.

3. Defendants' Motion to Exclude Certain Opinions and Testimony of Plaintiff's Expert Witness (**ECF No. 111**) is **GRANTED**.

4. The Joint Motion for Hearing and for Oral Argument on Pending Motions (**ECF No. 136**) is **GRANTED IN PART** in that the Court will consider argument on the waiver issue at the **Call of the Calendar on April 5, 2018, at 1:30 p.m.**

5. For purposes of clarity:

   a. Counts 1-12 are **DISMISSED WITH PREJUDICE** against all Defendants except Family Smiles.

   b. Counts 13-21 are **DISMISSED WITH PREJUDICE** as to Sameera Hussain; Dental Dreams, LLC, a New Mexico limited liability company; Frank Von

Westernhagen, and Khurram Hussain. Counts 13-21 remain against Defendant Family Smiles. The Court **RESERVES RULING** on whether it will dismiss Counts 13-15 and 19-21 against Dental Dreams, LLC a.k.a. Dental Experts, LLC, an Illinois limited liability company. The Court **RESERVES RULING** on whether it will dismiss Counts 13-21 against KOS Services, LLC.

c. Counts 22, 23, 24, 26, and 27 are **DISMISSED** against all Defendants.

d. Count 25 is **DISMISSED** as to all Defendants except Family Smiles.

e. Defendants Sameera Hussain; Dental Dreams, LLC, a New Mexico limited liability company; Frank von Westernhagern; and Khurram Hussain are **DISMISSED** from this case.

_____
**UNITED STATES DISTRICT JUDGE**